STATE EX REL. GOODMAN, RESPONDENT, *v.* STEWART, SECRETARY OF STATE, APPELLANT.

(No. 4,551.)

(Submitted January 19, 1920.    Decided January 30, 1920.)

[187 Pac. 641.]

*Constitution—Initiative and Referendum—Emergency Clause— Statutes and Statutory Construction — Elections — Primary Law—Amendment.*

Constitution—Initiative—Amendments—Power of Legislature.
    1.  Laws initiated and enacted by the people may be amended by the legislature the same as Acts passed by it, and the validity of such amendments does not depend upon favorable action by the people on a referendum vote thereon.

Statutory Construction—Adoption of Statute from Another State—Rule.
    2.  Unless the decision of the highest court of another state construing a statute appeals to the supreme court as founded upon right reasoning, it will not be followed simply because the statute was borrowed from that state after such construction.
    [As to the construction of an adopted statute, see notes in 1 **Ann. Cas.** 147; Ann. Cas. 1917B, 651.]

Constitution—Referendum—Emergency—Legislative Declaration not Conclusive.
    3.  *Held*, that the legislative declaration that an emergency exists and that for that reason a certain Act is necessary for the immediate preservation of the public peace and safety, making the Act nonreferable (Const., Art. V, sec. 1), is not conclusive, the question—backed

by facts—whether the Act is of such character being a judicial one determinable by the courts.

Statutes—Validity—Questions of Expediency, Necessity, *etc.,* of No Concern to Courts.

4. In passing upon the validity of a statute, courts are not concerned with the expediency, utility, justice of, or the necessity for, the legislation, nor with the question whether certain amendments enacted improve the original Act.

Constitution—Referendum—Emergency—How Determined.

5. In determining whether an Act is necessary for the immediate preservation of the public peace or safety, and so excepted from the power reserved in the people to have a referendum, courts may consider the face of the Act, the history of the legislation and contemporaneous declarations of the legislature, the evil to be remedied, and the natural or absurd consequences of any particular interpretation.

Evidence—Judicial Notice.

6. Courts will take judicial notice of the number of general and primary elections, and regular and special sessions of the legislature between two certain dates.

Constitution—Referendum—Meaning of Emergency Clause.

7. *Held,* that the exception embodied in Article V, section 1, of the Constitution, *i. e.,* that Acts necessary for the immediate preservation of the public health, peace or safety shall not be subject to the referendum,—was not intended to extend further than to matters arising out of some unforeseen menace, public calamity, accident, sudden emergency, extraordinary occurrence or unprecedented climatic condition, rendering immediate action imperative to prevent serious or irreparable injury to the public.

Statutory Construction—Legislative Intent.

8. In construing an Act, the intention of the law-making body should be ascertained and given effect.

Constitution—Statutes—Referendum—Primary Act—Not Proper Subject of Emergency.

9. *Held,* that Chapter 28, Laws of 1919, Extra. Session, amending the primary election law, was not necessary for the immediate preservation of the public peace and safety, and therefore not excepted from a referendum. (MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY dissenting.)

*Appeal from District Court, Lewis and Clark County; W. H. Poorman, Judge.*

PROCEEDING by the State, on the relation of Sam Goodman, against Charles T. Stewart, Secretary of State. Writ of prohibition issued, and defendant appeals. Reversed and remanded.

*Mr. S. C. Ford,* Attorney General, and *Mr. Frank Woody,* Assistant Attorney General, for Appellant, submitted a brief; *Mr. Woody* argued the cause orally.

This proceeding was instituted for the sole purpose of having it determined whether the declaration contained in section 13

of Chapter 28, Laws of 1919, Extra. Session, withdraws that Act from the referendum provisions of section 1 of Article V of the Constitution, so that the Act cannot be referred to the people for their rejection or approval at the general election in November, 1920.

Decisions construing provisions excepting from referendum Acts immediately necessary for the preservation of the public peace, health or safety, and those constitutional provisions with reference to the time when Acts shall become effective, and excepting therefrom Acts immediately necessary for the preservation of the public peace, health or safety, are not harmonious, each decision depending upon the particular wording of the constitutional provision of the state in which the decision is rendered. Some of these decisions hold that the legislative declaration of expression in the Act is conclusive, and the courts cannot review the same, while other, and it would seem the better reasoned decisions, hold that such declaration or expression is not conclusive, and that the courts may examine the Act and determine whether or not it does in fact fall within or without the exception. (See *Attorney General* v. *Lindsay,* 178 Mich. 524, 145 N. W. 98; *Miami County* v. *City of Dayton,* 92 Ohio St. 215, 110 N. E. 726; *State* v. *Whisman,* 36 S. D. 260, L. R. A. 1917B, 1, 154 N. W. 707; *Ex parte Hoffman,* 155 Cal. 114, 132 Am. St. Rep. 75, 99 Pac. 517; *McClure* v. *Nye,* 22 Cal. App. 248, 133 Pac. 1145; *Rigdon* v. *Common Council,* 30 Cal. App. 107, 157 Pac. 513; *State* v. *Meath,* 84 Wash. 302, 147 Pac. 11; *State* v. *Howell,* 85 Wash. 294, Ann. Cas. 1916A, 1231, 147 Pac. 1159; *State* v. *Howell,* 85 Wash. 281, 147 Pac. 1162; *State* v. *Clausen,* 85 Wash. 260, Ann. Cas. 1916B, 810, 148 Pac. 28.)

*Mr. Henry C. Smith,* for Respondent, submitted a brief and argued the cause orally.

The question to be determined by the court is whether the legislative assembly is the sole judge as to when and whether a law is "necessary for the immediate preservation of the public

peace and safety." Our supreme court has not passed directly on this question. In the case of *State ex rel. Ford* v. *Schofield,* 53 Mont. 502, 165 Pac. 594, the so-called *"Carter County" Case,* Mr. Chief Justice Brantly, concurring in the opinion of the court as expressed by Mr. Justice Holloway, said in relation to section 26, Article V, of the Constitution which declares: "In all other cases where a general law can be made applicable, no special law shall be enacted": "I am not satisfied that the injunction found in section 26, Article V, of the Constitution is addressed to the judicial department of the government. The creation of new counties is a matter of public policy. The propriety of creating one at any time depends upon fact conditions as they exist at that time. These the legislature can more readily ascertain and weigh than the courts. I therefore incline to the opinion that the injunction is addressed exclusively to the legislature."

However, in other states, this exact question has been decided. In the case of *Bennett Trust Co.* v. *Sengstacken,* 58 Or. 333, 113 Pac. 863, the supreme court of Oregon said: "The legislative branch of the government has the exclusive power to declare that its enactments are necessary for the immediate preservation of the public peace, health and safety, and that hence an emergency exists."

In the case of the *State* v. *Meath,* 84 Wash. 302, 147 Pac. 11, the supreme court of Washington held that the courts should scrutinize a legislative declaration of an emergency and "declare the declaration void in case it is obviously false." The case was decided by a divided court, five to four.

In the case of *Oklahoma City* v. *Shields,* 22 Okl. 265, 100 Pac. 559, the supreme court of Oklahoma said: "The declaring of an emergency by the legislature is conclusive upon the courts." To the same effect are the following cases: *Kadderly* v. *Portland,* 44 Or. 118, 74 Pac. 710, 75 Pac. 222; *In re Menefee,* 22 Okl. 365, 97 Pac. 1014; *Sears* v. *Multnomah County,* 49 Or. 42, 88 Pac. 522; *Dallas* v. *Hallock,* 44 Or. 246, 75 Pac. 204; *Hanson* v. *Hodges,* 109 Ark. 479, 160 S. W. 395; *State* v. *Moore,* 103 Ark.

48, 145 S. W. 199; *Van Kleeck* v. *Ramer*, 62 Colo. 4, 156 Pac. 1108; *State* v. *Crawford*, 36 N. D. 385, Ann. Cas. 1917E, 955, 162 N. W. 710; *State* v. *Bacon*, 14 S. D. 394, 85 N. W. 605; *State* v. *Summers*, 33 S. D. 40, Ann. Cas. 1916B, 860, 50 L. R. A. (n. s.) 206, 144 N. W. 730; *Southerland* v. *Miller*, 79 W. Va. 796, L. R. A. 1917D, 1040, 91 S. E. 993.

We request the court also to examine the case of *State* v. *Marcus*, 160 Wis. 354, 152 N. W. 419, paragraphs 2, 3 and 4 of the opinion by Judge Marshall, as to the importance of the question and the duty resting upon the court to remove the doubt and uncertainty existing. Even the supreme court of Washington has practically nullified its decision in the *Meath Case, supra,* in the case of *State* v. *Howell,* 85 Wash. 294, Ann. Cas. 1916A, 1231, 147 Pac. 1159.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

At the general election held in November, 1906, the people adopted an amendment to section 1, Article V, of the state Constitution, which, by executive proclamation, became a part of the Constitution December 7, 1907. Said section 1 of Article V, as amended, in so far as it is pertinent here, reads as follows:

"The legislative authority of the state shall be vested in a legislative assembly, consisting of a senate and house of representatives; but the people reserve to themselves power to propose laws, and to enact or reject the same at the polls except as to laws relating to appropriations of money, and except as to laws for the submission of constitutional amendments, and except as to local or special laws, as enumerated in Article V, section 26, of this Constitution, independent of the legislative assembly; and also reserve power at their own option, to approve or reject at the polls, any Act of the legislative assembly, except as to laws necessary for the immediate preservation of the public peace, health or safety, and except as to laws relating to appropriations of money, and as to laws for the submission of constitutional amendments, and except as to local or special laws,

as enumerated in Article V, section 26, of this Constitution.  The first power reserved by the people is the initiative and eight per cent of the legal voters of the state shall be required to propose any measure by petition; provided, that two-fifths of the whole number of the counties of the state must each furnish as signers of said petition eight per cent of the legal voters in such county, and every such petition shall include the full text of the measure so proposed.  *  *  *  The second power is the referendum, and it may be ordered either by petition signed by five per cent of the legal voters of the state; provided, that two-fifths of the whole number of counties of the state must each furnish as signers of said petition five per cent of the legal voters in such county, or by the legislative assembly as other bills are enacted.''

At the general election of 1912 the people, in the exercise of the power so reserved to them, initiated a direct primary law. (Session Laws 1913, p. 570.)   July 29, 1919, the legislative assembly met in extraordinary session to consider matters connected with the drought conditions, and, on request of that body, the governor specially empowered them to take action with reference to the primary election laws.   Under this power the legislature amended the primary election law of 1912 in certain particulars, as will be hereafter noted.   (Chap. 28, Laws of Extra. Session 1919.)   Section 13 of this Act reads as follows: ''This Act is declared to be an emergency law, and a law necessary for the immediate preservation of the public peace and safety.''

A referendum petition was thereafter circulated, and, those from a number of the counties having been filed with the secretary of state, this action was instituted in the district court of Lewis and Clark county to prevent the filing of further petitions.   A demurrer was interposed and overruled, judgment entered, and a writ of prohibition issued against appellant.   This appeal is from the judgment.

1. It is urged by respondent that the declaration by the legislature of an emergency is conclusive upon the courts, and in support of this petition counsel cites: *Kadderly* v. *Portland,* 44 Or. 118, 74 Pac. 710, 75 Pac. 222; *In re Menefee,* 22 Okl. 365,

97 Pac. 1014; *Sears* v. *Multnomah County,* 49 Or. 42, 88 Pac. 522; *Dallas* v. *Hallock,* 44 Or. 246, 75 Pac. 204; *Hanson* v. *Hodges,* 109 Ark. 479, 160 S. W. 395; *State* v. *Moore,* 103 Ark. 48, 145 S. W. 199; *Van Kleeck* v. *Ramer,* 62 Colo. 4, 156 Pac. 1108; *State* v. *Crawford,* 36 N. D. 385, Ann. Cas. 1917E, 955, 162 N. W. 710; *State* v. *Bacon,* 14 S. D. 394, 85 N. W. 605; *State* v. *Summers,* 33 S. D. 40, Ann. Cas. 1916B, 860, 50 L. R. A. (n. s.) 206, 144 N. W. 730; *Southerland* v. *Miller,* 79 W. Va. 796, L. R. A. 1917D, 1040, 91 S. E. 993.

In certain of the cases cited, however, the courts were not called upon to construe constitutional provisions such as we now have under consideration, while in others, as will be hereinafter shown, the decisions have been overruled or superseded by later opinions announcing a different rule.

The referendum is a comparatively modern institution, and has been adopted in less than a fourth of the states of the Union, and, consequently, but few of the courts have been called upon to determine the question here involved, and, as is perhaps natural on entering a new field in which an absorbing interest is taken, a great diversity of opinion has been expressed, not only as between the courts of the several states where the provision has been construed, but also as between the learned judges composing those courts. However, a careful analysis of the authorities will, we believe, disclose the fact that conflicting and contradictory opinions expressed are not so much the result of disagreement as to the general rule applicable, as to the application thereof to particular statutes, and a mistaken assumption on the part of many jurists that the same principle applies to the question here involved as to the questions arising upon statutes and constitutional provisions providing for the declaration of an emergency for the mere purpose of abridging the time in which Acts of the legislature shall go into effect, which class of provisions and litigation existed prior to the adoption of the initiative and referendum provisions in any of the states.

The attorney general suggests that a law initiated by the [1] people cannot be withdrawn from its peculiar position by

an amendment by the legislature, no matter what the circumstances, but that in the case of all initiated Acts the people have the right to the ultimate determination of whether or not the amendments shall be adopted.   This suggestion is without merit.

Prior to the adoption of the initiative and referendum amendment to our Constitution, the people of the state, in whom, originally, all power is vested, had delegated to their representatives, the legislative body, the exclusive authority to make laws for the government of the state, subject only to such restrictions as were found in the Constitution and the exercise of the executive veto.   By the adoption of the amendment the people did no more than recall that exclusive authority, and reserve to themselves the power to propose laws, and to accept or reject them at the polls, on any subject, save those subjects enumerated in the excepting clauses contained in the amendment.   Thereafter, on those subjects not excepted, either the people or the legislature may act at will—their power is coextensive; when an Act is passed by either method, it becomes the law of the state, no more and no less.   "Laws proposed and enacted by the people under the initiative clause of the amendment are subject to the same constitutional limitations as are other statutes, and may be amended or repealed by the legislature at will."   (*State ex rel. Evans* v. *Stewart,* 53 Mont. 18, 161 Pac. 309; *Kadderly* v. *Portland,* 44 Or. 146, 74 Pac. 710.)

2. The question of the propriety of the writ of prohibition to control the action of the secretary of state is not raised in this action, and will not be disposed of in this opinion.

3. Taking up the analysis of the authorities cited, the first to be considered is that of *Kadderly* v. *Portland, supra.*   It would seem from the statement of facts that the city of Portland previously organized an improvement district.   The original assessment was adjudged invalid for failure to comply with the requirements of the city charter in force.   Later, in January, 1903, the legislature passed an Act "for the incorporation of the city of Portland," attached thereto an "emergency clause," which reads as follows: "Whereas, there are several bridges

upon important thoroughfares and car lines in the city of Portland, now old and in a dilapidated and ruinous condition, dangerous to life and property; and whereas, there is an immediate necessity for the construction of new bridges in the place of said old ones, in order to provide for the safety of the people of said city; and whereas, there are no ways or means by which, under the present charter of said city, new bridges can be constructed in place of the old ones; and whereas, the foregoing Act provides ways and means available at once for the construction of new bridges; and whereas, there is otherwise a necessity for the immediate adoption of the foregoing Act to insure the health, peace, and safety of the people of Portland; Therefore, this Act shall take effect and be in force from and after its approval by the governor.'' (Sp. Laws 1903, p. 172.) In February, within thirty days, the council proceeded to act under the provisions named, and thereupon suit was commenced; the contention being, among other things, that the charter under which the city was attempting to proceed did not go into effect until ninety days after the adjournment of the legislature, because of the initiative and referendum amendment adopted in 1902. The court held that '' 'when the legislature enacts a law, the only question which we can decide is whether the limitations of the Constitution have been infringed upon.' The amendment excepts such laws as may be necessary for certain purposes. The existence of such necessity is therefore a question of fact, and the authority to determine such fact must rest somewhere. The Constitution does not confer it upon any tribunal. It must therefore necessarily reside with that department of the government which is called upon to exercise the power. It is a question of which the legislature alone must be the judge, and when it decides the fact to exist its action is final.'' (Citing *Biggs* v. *McBride*, 17 Or. 640, 5 L. R. A. 115, 21 Pac. 878; *Umatilla I. Co.* v. *Barnhart*, 22 Or. 389, 30 Pac. 37; *Gentile* v. *State*, 29 Ind. 409; *Wheeler* v. *Chubbuck*, 16 Ill. 361; *State* v. *Bacon*, 14 S. D. 394, 85 N. W. 605.)

We believe the learned justice who wrote the opinion based his conclusion on a false premise; he argues that because the question is a question of fact, and the authority to determine that fact rests "somewhere," and the Constitution has not conferred it upon any tribunal, it must necessarily rest with the legislature. If the reasoning was sound, it would apply with equal force to questions arising as to whether Acts were in violation of the state Constitution, and on the passage of local and special laws on the prohibition subjects; for here also "the authority to determine it must rest somewhere," and "the Constitution does not confer it upon any tribunal."

We are also convinced that the learned writer of that opinion fell into the error of confounding the question involved with that in the decisions dealing with enactments under which the emergency clause did no more than to abridge the time within which laws should take effect. In support of this statement, we call attention to the cases cited in aid of the conclusion reached.

The case of *Biggs* v. *McBride* was decided in 1889, long before Oregon adopted the initiative and referendum amendment, and, in fact, before such an amendment was adopted in any state in the Union. It was there held that the determination of an emergency, in order to permit an Act to take immediate effect, is "political, and not judicial, and when the legislature has declared an emergency, their act is not reviewable elsewhere, and is conclusive upon the courts."

In neither Indiana nor Illinois did they have a referendum, and the question here considered, and involved in the *Kadderly Case,* was not, therefore, passed upon.

The case of *State* v. *Bacon* will be hereafter considered.

The distinction we draw between the two classes of emergency legislation is clearly expressed in the leading case opposed to the "Oregon rule," of *State ex rel. Brislawn* v. *Meath,* 84 Wash. 302, 147 Pac. 11, as follows: "Where there is a declaration in the Constitution that no law shall take [immediate] effect unless in a case of emergency, to be declared by the legislature, it may

be truthfully said that the general rule is that a court will not review the declaration of the legislature; but where the people have put upon the legislature a limitation in the way of a specific definition of its power, and an elimination of Acts of a certain character, the rule is that the declaration of an emergency must conform to the constitutional requirement. [Quoting from 36 Cyc. 1193, 1194] : 'In those jurisdictions in which, under the general rule, statutes do not take effect until some time subsequent to their passage and approval, it is commonly provided that when an emergency exists the legislature may declare a statute in force from its passage. Under such provisions the legislature is the sole judge as to whether the emergency exists, and its declaration is not open to question by the courts. Where, however, such special provisions, permitting the legislature to except statutes from the general rule, are found in the Constitution, the legislative declaration that an emergency exists must conform to the constitutional requirements, and must be clear, distinct, and unequivocal.' " After quoting from the *Kadderly Case,* the writer of the opinion continues: "We hesitate to match opinion with one so learned in the law as the writer of this opinion, but conscience impels a different conclusion. His argument is fallacious and unsound. Under the old form, the legislature was acting under a free license to legislate. The people had reserved no right of review. Its act implied discretion, and courts have very properly held that one co-ordinate branch of the government will not review the discretion of another. There was no review or appeal from an expression of that discretion, however violently it wrenched the moorings of constitutional restraint. The declaration of an emergency was final and conclusive. But here no such declaration is final, and should be given no immediate effect unless it can be fairly said that the Act is necessary to preserve the health, peace, or safety of the state." Again, returning to the question presented, the writer says: "The whole error in the reasoning of the respondents, and the cases upon which they rely, is based upon the fundamental error that this inquiry involves a controversy of opinion between two

co-ordinate branches of the government. If the equation could be so stated, we might follow them. It cannot be so stated. There is another factor not occurring under the old order where we took account of the executive, the representative body (the legislature), and the courts. There is now a fourth element, the people, reserving the right to assert its will over the legislative department of the government.'' In the *Meath Case* the court was divided, five being for and four against the rule laid down.

In the case of *Van Kleeck* v. *Ramer,* cited by counsel, three of the members adopted the ''Oregon rule,'' while two dissented; Justice Scott writing a vigorous and somewhat humorous dissenting opinion, in which he had this to say of the *Kadderly Case:* ''The question we are considering * * * was no more than incidentally considered by the Oregon court, and not there fully nor fundamentally reasoned, in the light of the new principle in popular government [the referendum]. The holding in that case has been blindly followed and as hastily considered by those courts which have adopted the conclusion, *viz.,* Arkansas, Oklahoma, and North Dakota, and now by the majority opinion in this case. No one of these courts, including the present case, has offered any additional reason, but have complacently adopted the false premise there assumed. I take it that the Oregon court was misled by previous judicial consideration of emergency legislative constitutional provisions, and the failure to distinguish as between these and the language and principle involved in the initiative and referendum emergency provisions.'' We note that the writer refers to *North* Dakota; that is, perhaps, a stenographic or clerical error, as the state of North Dakota had not at that time passed upon the question, while *South* Dakota had disposed of the question in the manner indicated. The question was not raised in North Dakota until the case of *State* v. *Crawford, supra,* was decided April 28, 1917.

It might be suggested here, also, that the Oregon court may have been driven to an erroneous declaration of the law by the necessity for the inevitable conclusion reached. As suggested by Justice Scott, there were many important questions to be deter-

mined in the case; the question here involved was but incidental. No one, we take it, on reading the emergency declaration in that case, would presume to say that it did not appear that the conclusion that an immediate necessity existed was inevitable. Realizing the urgency of the necessity, and being familiar with the old rule of construction, proper in the absence of the existence of the initiative and referendum, it is possible that the learned writer of that opinion merely took the wrong lane to reach his proper destination.

The case of *Sears* v. *Multnomah County*, cited, is not in point, as the question here involved was not considered. While it cites the *Kadderly Case*, it was merely in connection with the relation of the initiative and referendum amendment to the provision of their Constitution as to the time when Acts should become effective, and, if an authority on the one side or the other, was rather against respondent, as the court there set aside the attempt of the legislature to cause the Act in question to be immediately effective.

4. It is suggested by respondent that, "the constitutional [2]   provision having been adopted from Oregon after a similar one had been construed by the highest court of that state, the presumption is that we intended to adopt the same construction." We have compared the Oregon amendment with our own, and cannot say that our provision bears any more resemblance to the Oregon amendment than to that of any other state adopting such amendment; but, were they identical, our answer to the suggestion is: "The decision of the court of another state construing a statute thereof will not be followed by the court of a state borrowing such statute, unless the decision appeals to it as founded on right reasoning." (*Ancient Order of Hibernians* v. *Sparrow*, 29 Mont. 132, 101 Am. St. Rep. 563, 1 Ann. Cas. 144, 64 L. R. A. 128, 74 Pac. 197; *Finlen* v. *Heinze*, 28 Mont. 548, 73 Pac. 123; *State ex rel. Ford* v. *Schofield*, 53 Mont. 502, 165 Pac. 594.)

*State* v. *Bacon* and *State* v. *Summers*, cited, were long since, in effect at least, overruled by *State* v. *Whisman*, 36 S. D. 260,

L. R. A. 1917B, 1, 154 N. W. 707, holding that "As to all emergency measures * * * within the purview of the exception, the legislature may declare an emergency to exist, * * * and such declaration and finding * * * is final, and not within the power of the court to question. But as to any measure * * * not within the class, * * * the legislature has no power or authority to declare an emergency to exist, * * * and the action of the legislature in embodying emergency clauses in measures clearly not comprehended within the said exception are wholly unwarranted and void, and should be so held by the courts."

So in the Oklahoma cases of *In re Mcnefee,* cited, though the Oregon rule was adopted, and later followed in *Oklahoma City* v. *Shields,* 22 Okl. 265, 100 Pac. 559, the court did not hesitate to declare, in the case of *Riley* v. *Carico,* 27 Okl. 33, 110 Pac. 738 (1910), the legislative declaration that an Act was "necessary for the immediate preservation of the peace, health, and safety unconstitutional and void," where it clearly appeared that the legislature had obviously exceeded its constitutional authority.

The supreme court of North Dakota has, within the last few days, held an attempt of the legislative assembly to declare certain legislation "emergency legislation," by the passage of a separate Act, unconstitutional and void. (*State ex rel. Langer* v. *Olson* (N. D.), 176 N. W. 528.)

We will proceed, then, to the consideration of those cases announcing rules under which the court will consider and determine the question before it.

In this class of cases we believe there are two rules: The first, making no distinction between those emergency Acts which affect merely the time within which Acts shall become effective, and those falling within the exceptions contained in the referendum provisions, and applying to the question the old rules of constitutional and statutory construction; the second, recognizing a clear distinction between the two classes of legislation, and declaring that as to the latter the old rules do not apply.

The case of *Attorney General* v. *Lindsay,* 178 Mich. 524, 145 N. W. 98, falls within the first class, although many expressions in the opinion would not seem to justify the strictness of the rule finally announced; and here, as in most of the cases cited on this question, a great diversity of opinion existed among the distinguished members of the court itself.    In this case the Chief Justice, whose opinion is, however, not concurred in by any of his associates, points out: ''These cases relied upon by respondents, with practical unanimity, base their decision upon this specific provision that an emergency was to be determined by the legislature and declared in the Act.    The construction of their constitutions in this respect by the courts of these states may be a proper construction, bringing the provision within the exceptions to the general rule recognized by Judge Cooley.    *   *   * [Cooley's Const. Lim., 7th ed., 76.]    The declaration by our legislature (not required by our Constitution), in the body of the Act under consideration, that it was 'immediately necessary for the preservation of the public peace, health and safety,' gives it no added weight;    *   *   *   a reasonable inference which might be drawn from such superfluous declaration is that there existed a doubt in the legislative mind as to whether in fact this Act would come within the classification of this provision.''    Chief Justice McAlvay then proceeds to state what he considers the rule applicable in a case such as we are considering, which sufficiently appears from the opinion in the case, written by Justice Brooke, who states the ''Michigan rule'': ''I agree with my Brother McAlvay that the constitutional provision in question imposes a definite limitation upon legislative action, and that the legislature cannot, with impunity, disregard that limitation    *   *   *   that where rights are affected by the improper or illegal action of the legislature,    *   *   *   and the injured party has recourse to the courts, the question whether the legislature has acted *within* or *without* the bounds of its constitutional powers is one for judicial determination.    In such a case the courts are bound to exercise their constitutional functions, primary among which is the duty to determine whether the legisla-

tive action questioned *is or is not* constitutional.  *  *  *  In acting under the section in question, the legislature is not above or beyond the law.  It is as certainly bound by the limitations. fixed as by any others contained in the instrument.  When the question is presented to the courts  *  *  *  it must be met and determined the same as any other constitutional question.'" At this point the argument is discontinued, and the writer continues: "In reaching a determination, however, I am of opinion that every intendment should be taken in favor of the propriety of legislative action.  In cases of doubt, the court should never interfere to thwart the legislative will, but, where the action constitutes a clear violation of the limitations imposed, it should unhesitatingly be held to be invalid."  Applying the rule so laid down to the particular Act before the court, the writer concludes: "I do not think it can be said with certainty that the Act in question *was not* immediately necessary for the preservation of the public peace, health, and safety, and the courts should interfere only where that conclusion is inevitable."  With the statement of this rule three of the Associate Justices concur, while two dissent, holding that the Oregon rule should be adopted.

The question has been more fully considered by, and more often in, the supreme court of Washington than in any of the states, and the leading case opposed to the *Kadderly Case* is that of *State ex rel. Brislawn* v. *Meath,* referred to while considering the Oregon doctrine.  There the Washington case is cited with approval, and all the declarations of their Chief Justice accepted. Commenting on the *Kadderly Case,* the Washington court says: "The learned justice who wrote the opinion in the *Kadderly Case* is in error when he says the obvious answer to the question, 'What remedy will the people have if the legislature, either intentionally or through mistake, declares falsely or erroneously that a given law is necessary for the purposes stated?' is 'that the power has been vested in that body, and its decision can no more be questioned or reviewed than the decision of the highest court in a case over which it has jurisdiction.'  *  *  *  On the contrary, power has been *withheld,* in so far as a withholding

can be made by apt and certain words. It follows, then, that it is a question of power rather than of discretion. The limitation of that power must be found in the terms of the Constitution, construed in connection with the intent of the people in incorporating such a provision in the Constitution.'' (Citing *Attorney General* v. *Lindsay, supra.*)   The court then points out that it is not sufficient to say that the people still have the right of the initiative to repeal an objectionable law; that ''if the people had been content to adopt that plan alone, they would not have reserved the right of the referendum at all. When, therefore, the question comes whether the legislature has a right to declare an emergency which will take away the right of referendum *the doubt, if there be any, should be resolved* in favor of the reserved power of the people instead of in the admittedly unwarranted declaration by the legislature. And in so declaring the courts do not assume * * * that the legislature has abused its discretion. They go no further than to say that the legislature cannot, by any Act which is *not clearly* within its granted power, cut off the right of the people to say for themselves, at an election to be held for that purpose, whether its discretion has been abused or no.'' ''The people, having the old law, the mischief, and the remedy in mind, have said one thing; the legislature, prompted by no apparent motive to preserve the peace and safety of the state, * * * have said another thing. When confronted by these two conflicting declarations, what is a court to do when its jurisdiction is properly invoked? Is it to say, it is helpless * * * ?'' (The italics above are ours.)

It is true the court, having thus stated the true rule and emphasized the fact that the doubt should be resolved in favor of the reserved right of the people, attempted to state the rule concisely, and in doing so seems to have contradicted its direct statement, logically reasoned while stating it; for we find in the opinion this statement: ''The true rule is the referendum cannot be withheld by the legislature in any case except it be where the Act touches the immediate preservation of the public peace, health, or safety. * * * If the Act be doubtful, the question

of emergency will be treated as a legislative question, and the doubt resolved in favor of the declaration of emergency made by the legislative body." The decision in the case was by a divided court, four of the nine justices dissenting, seeking the adoption of the Oregon rule; the opinion has, however, been followed consistently. (*State* v. *Howell,* 85 Wash. 294, Ann. Cas. 1916A, 1231, 147 Pac. 1159; *State* v. *Howell,* 85 Wash. 281, 147 Pac. 1162; *State* v. *Clausen,* 85 Wash. 260, Ann. Cas. 1916B, 810, 148 Pac. 28; *State* v. *Howell,* 106 Wash. 543, 181 Pac. 37.)

While the determination of the question was not necessary to a decision, the supreme court of Ohio also declared against the position taken by respondent, as follows: "Manifestly the legislature's judgment in that behalf, as shown by the Act itself and the records touching the same, is not conclusive. The people's right to a referendum on any Act of the legislature may be asserted, in a proper proceeding and at a proper time, notwithstanding the action of the general assembly." (*Miami County* v. *City of Dayton,* 92 Ohio St. 215, 110 N. E. 726.)

The supreme court of California has had the question before it in a number of cases, and, while we may not agree with it on the determination of facts in certain cases, particularly that of *Ex parte Hoffman,* 155 Cal. 114, 132 Am. St. Rep. 75, 99 Pac. 517, we agree with its reasoning and with the rule of law adopted.

In *McClure* v. *Nye,* 22 Cal. App. 248, 133 Pac. 1145, the court said: "The said legislative declaration has *no* greater effect and is no more binding upon the court than if the legislature had declared that a certain measure is or is not constitutional. In such contingency that question would still remain for the courts to determine. The question before us is simply one of construction or interpretation of an Act of the legislature and of a provision of the Constitution, and that is a judicial question." "This amendment to the Constitution provides a scheme for the exercise of what is known as the initiative and referendum, *and, of course, if possible, the language* should be construed so as to make effective this reservation of power on the part of the people. It was clearly their purpose, except where the exigency of the public

service demanded otherwise, that no legislative enactment should become operative until an opportunity was afforded the people to express their judgment as to the merits of the measure.   *   *   * The exceptions   *   *   *   are ample enough to prevent any menace to the public welfare by reason of such delay incidental to a submission to popular vote, and they should not be given an interpretation so elastic as to virtually circumvent and nullify the will of the people so solemnly expressed in said constitutional provision.''

And in *Rigdon* v. *Common Council,* 30 Cal. App. 107, 157 Pac. 513, the same court says: ''We do not find it argued on behalf of appellants that the mere fiat of the council, expressed in the repealing ordinance, to the effect that the public health and safety demanded that the repealing ordinance should take immediate effect, is of any force or virtue whatever.''

And in *Ex parte San Chung,* 11 Cal. App. 511, 105 Pac. 609, the court held: ''While, in general, it is for the legislature to determine what laws and regulations are needed for the public health, safety, and comfort, statutes attempted to be sustained as an exercise of police power must have some relation to these ends, and if, under guise of police regulation, an attempt is made to violate personal or property rights, they will be overthrown by the courts.''

In Nebraska the court has declared that the mere fact of declaring an Act an ''Emergency Act'' does not make it such. (*State* v. *Pacific Exp. Co.,* 80 Neb. 823, 18 L. R. A. (n. s.) 664, 115 N. W. 619; and three other cases against express companies, disposed of by the same opinion, and reported in 80 Neb. 838, 115 N. W. 625.)

While *Hamilton* v. *Kentucky Distilleries, etc.* (U. S.), 40 Sup. Ct. Rep. 106, holds that the court may not pass upon the necessity of the exercise of a power possessed, such a declaration is not controlling here, as it is not the question under consideration. Here we are considering, not the exercise of a discretion by the legislature, but the attempted abrogation by the legislature of a power reserved to the people.  · If the Act.

in question falls within the exception to the right to exercise that reserved power, no one will question the right and propriety of the legislative declaration, whether necessary to the Act or not, nor will the court attempt to interfere. But it must be remembered that we are not passing upon the validity of a statute nor attempting to overthrow any Act of the legislature. The amendments made to the primary law are valid and will stand as made by the legislature unless rejected by the people at the polls. The only effect of the decision of the court will be either to declare the Act in immediate effect, and foreclose the people of the state from passing upon it, or to permit the suspension of the Act, in the manner provided for in the referendum amendment to the Constitution, until such a time as the people shall have the opportunity to either adopt or reject those amendments at the polls. We are merely called upon to decide whether an admittedly valid and proper Act of the legislature comes within the class of Acts which may, by proper proceedings provided for in the Constitution, be referred to the people, or whether it falls within the exception to the reserved right.

In the case of *Mugler* v. *Kansas*, 123 U. S. 623, 661, 31 L. Ed. 205, 8 Sup. Ct. Rep. 273, 297, the supreme court of the United States has this to say on the subject: ''The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty—indeed, are under a solemn duty—to look at the substance of things, whenever they enter upon the inquiry whether the legislature has transcended   *   *   *   its authority. If, therefore, a statute purporting to have been adopted to protect the public health, the public morals, or the public safety has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.''

The question has never been before this court, but a somewhat analogous case is found in *State ex rel. Ford* v. *Schofield,* 53 Mont. 502, 165 Pac. 594, in which Mr. Justice Holloway, writing the opinion, declares that, upon the question as to who shall

determine whether a general law can be made applicable in any given instance the decisions are in hopeless conflict. "The cases cited by respondents hold that the question is one exclusively for legislative determination, while cases cited by relator hold with equal emphasis that it is one for decision by the courts.  *  *  * We find ourselves unable to agree entirely with either theory established by the adjudications to which reference has been made.  *  *  * We believe there are many subjects of legislation which, from their inherent character, are subject to regulation by general laws, and that the courts are as advantageously situated as any other department of government to say so; on the other hand, there are certain subjects which may or may not lend themselves to regulation by general laws, depending upon extrinsic facts and circumstances which the legislature is peculiarly fitted to ascertain and determine, but which the courts have no means available to ascertain. Upon the first class of subjects the courts can and must determine the applicability of general laws; upon the second, the legislature must be left free to act."

Here, as in the *Schofield Case,* we may say that the decisions are in hopeless conflict; but a careful analysis of all of the authorities cited by appellant and respondent, together with others disclosed by independent research, has convinced us that there is not so great a conflict as would appear from a superficial examination of the authorities. Much of the confusion arises from the assumption, on the part of the courts, that there is no distinction in principle between those cases treating of legislative declarations dealing with emergency clauses, which merely abridge the time in which statutes or ordinances shall go into effect, and consequently raise merely the question as to the propriety of the legislative action under consideration, and that class of cases dealing with the preservation of the public peace, health and safety, and which infringe upon the reserved power of the people to refer the Act under consideration. As to the first class of cases, we concede that the strict rules of constitutional and statutory construction, laid down in the Michigan case cited, to-wit: "Every intendment should be taken in favor of

the propriety of legislative action," and "in case of doubt" the doubt will be resolved "in favor of the propriety of legislative action," prevail.    We are not here called upon, however, to determine merely the constitutionality of a legislative Act, or to decide as to whether a legislative body clearly exceeded its authority; but we are to determine a legal controversy between two law-making bodies of the state—on the one hand the people, who are supreme, the creator of the legislature, in whom, originally, all power is vested; and, on the other hand, the legislature, the creature of the people.    Such a controversy, we believe, involves more than the determination of a mere negative question, as would be the case were we to apply the Michigan rule strictly.

We hold, therefore, to the rule laid down in the case of *State ex rel. Brislawn* v. *Meath,* cited that "When, therefore, the question comes whether the legislature has a right to declare an [3]    emergency which will take away the right of referendum, the doubt, if there be any, should be resolved in favor of the reserved power of the people, instead of in the admittedly unwarranted declaration by the legislature."    Our constitutional provision does not provide for any declaration on the part of the legislature in order to bring any Act within the class on which a referendum can be ordered.    The legislature might, with propriety, determine the question, while considering a bill, and incorporate the fact conditions in the Act itself, but such action on their part is not necessary.    This proceeding might have been, with equal propriety, commenced had the legislature made no declaration of necessity; the facts are controlling, and not the declaration of the legislature, which, unsupported by facts shown, amounts to nothing more than a legal conclusion.

The declaration that the Act is necessary for the immediate preservation of the public peace and safety has no more binding force than would the declaration in an Act that "this Act is constitutional," or "this is a general and not a local or special Act."    (*State ex rel. Brislawn* v. *Meath, supra; Ex parte*

*Hoffman, supra; McClure* v. *Nye, supra.*)   The declaration is, then, the "unwarranted declaration of the legislature."

In this country the power once vested in a king vests in the people, and the courts sit as their representatives.   (*Bridges* v. *McAlister,* 106 Ky. 791, 90 Am. St. Rep. 267, 45 L. R. A. 800, 51 S. W. 603.)   Under the federal Constitution, the duty of determining and declaring the constitutionality of an Act by the courts is imperative.   (U. S. Const., Art. VI.)   Whenever, therefore, a legal controversy arises over the constitutionality of an Act, or as to whether a given Act is within or without the authority of the legislature, the determination of that fact is essentially a judicial question, to be determined by the courts.   (*McClure* v. *Nye, supra; Ex parte Hoffman, supra; State ex rel. Brislawn* v. *Meath, supra.*)

5. We proceed, then, to the consideration of the Act itself, shorn of the superfluous conclusion of the legislature that the Act is "necessary for the immediate preservation of the public peace and safety."

With the expediency, utility, justice or the necessity for the [4] legislation we are not concerned; neither is it within our authority, nor do we wish to say whether or not the amendments enacted would improve the original primary law.   (*State ex rel. Taylor* v. *Duncan,* 52 Mont. 69, 155 Pac. 1111; 25 R. C. L. 808.)   All that we are concerned with is the necessity of the passage of the Act, without permitting the people to accept or reject it at the polls, under their reserved right, for the *immediate* preservation of the public peace and safety.   This consideration, we feel in the present instance, embraces more than a mere scanning of the Act to determine whether "the conclusion is inevitable" that the Act *"does not* fall within the limitation," but requires, under the rules heretofore laid down, an actual determination on the part of the court as to whether or not the Act does actually come within that class of subjects necessary for the immediate preservation of the public peace and safety.   It is no idle play of words, but an actual and solemn duty, devolving upon the court to determine, as between two litigants having

coextensive power of legislation, except where restricted, as to where lies the right.

"The people said to the legislature: Make such laws as you will, but you may not legislate so as to take away our right to pass upon the laws you have enacted, 'except such laws as may be necessary for the immediate preservation of the peace, health, and safety.' * * * To hold that the old rule of construction applies is to write this reservation out of the Constitution. * * * The reservation in the amendment is a declaration of 'thou shalt not,' except it be for the safety or support of the state." (*State ex rel. Brislawn* v. *Meath, supra.*)

Having arrived at the conclusion that from the modern trend of the authorities on the comparatively new question, and from reason and logic, the rule we should adopt is that the declaration by the legislature is not final nor conclusive, nor is to be considered merely as a contemporaneous declaration or expression of the legislature, and that the question must be determined by the courts as arbiters between two equally powerful bodies of the same branch of the government, and in that determination the doubt as to whether the Act in question is or is not immediately necessary for the purpose named, if any there be, shall be resolved in favor of the people, in whom the power originally vested and who have reserved the power to themselves to refer any Act, except in those instances enumerated, we will seek to apply the rules laid down to the matters set forth.

In this determination the utmost that we can take into [5] consideration will be the face of the Act itself; the history of the legislation, and contemporaneous declarations of the legislature (*Carpenter* v. *Rodgers*, 1 Mont. 90; *Melzner* v. *Northern Pac. Ry. Co.*, 46 Mont. 162, 127 Pac. 146); the evil to be remedied (*Johnson* v. *Butte C. Co.*, 41 Mont. 158, 48 L. R. A. (n. s.) 938, 108 Pac. 1057); and the natural or absurd consequences of any particular interpretation (*Blevins* v. *Graham Co.* (Okl.), 182 Pac. 247).

We find from the face of the Act that the original primary election law was "initiated and passed at the general election of

1912," and has been in force and effect for more than six years prior to the amendment. Analyzing the Act, we find it makes the following changes:

1. Changes the time of holding primaries so that in a presidential election year we shall have but one primary election.

2. Provides for rotation of names on the primary ballot.

3. Prohibits a candidate, defeated in the primary, from appearing on the ballot in the general election, except under certain conditions.

4. Changes the primaries from "open" to "closed" primaries.

We find from contemporaneous declarations of the legislature, through the joint committee report, that "the operation of the present primary law, during the years it has been in force prior to the election of 1918, resulted in so much complaint of the interference by others than members of the party in the primary of the party, and of the expense attendant upon holding two primary elections in presidential years, and criticism directed at other features of the law, that" both the Republican and the Democratic parties "paid heed" to the criticisms, and declared in favor of amending the law; that in response to these declarations the legislative assembly of 1919 passed an Act amending the law, which Act was, however, to be submitted to the people at a special election to be held September 2, 1919. (Chap. 113, Laws of 1919.) We find further from this report that the purpose in submitting the Act to the people at a special election, rather than to wait until the general election of 1920, was that it "would enable them [the people] to decide upon such amendments, without having the question confused or obscured by being voted upon at a general election, where a multitude of other important questions and the selection of many candidates for various offices might tend to preclude a careful consideration of the law so submitted." Certain persons having attempted to subject the referendum measure to a referendum by petition, the secretary of state, on advice of the attorney general, attempted to halt the special election, and the committee, deeming the time too short to determine the matter, recommended further action

by the legislature, "in view of the general sentiment in favor of amending the present law so as to preserve party unity and integrity, and to save the expense of two primaries in presidential election years, and to correct other manifest imperfections in the present law."

As to the duplication of primary elections in presidential election years, the matter was called to the attention of the court, and by this court called to the attention of the people in December of 1915, by the opinion of this court, speaking through Mr. Justice Sanner, in *State ex rel. Taylor* v. *Duncan,* 52 Mont. 69, 155 Pac. 1111, where the court said: "That these [the primary election] laws are an attempt by the people to enact in this state the general features of the primary law of Oregon cannot be open to doubt, and it must likewise be conceded that the effort to adapt the provisions of that law to the legislative and other conditions of this state has been most unskillfully performed. * * * The Oregon law * * * constituting one law, the effect of which is to require but one primary election in presidential years. Had it been the intention to so provide in this state, the Oregon law as a whole would doubtless have been enacted in one law. This was not done."

The court will take judicial notice of the fact that between [6] the time of the adoption of the primary election law and the convening of the extraordinary session of the legislature in 1919 three general elections had been held in the state, and three primary elections for the nomination of state and county officers, and one primary election for the nomination of presidential electors, and that during said period the legislature had convened in regular session four times, and, in addition thereto, a special session of the legislative assembly was called in the year 1918.

Finally, we have the contemporaneous declaration of the legislature contained in the Act itself, that "this Act is declared to be an emergency law, and a law necessary for the immediate preservation of the public peace and safety." (Sec. 13, Chap. 28, Laws Extra. Session 1919.)

We feel that the foregoing *résumé* contains the limit of the matters which the court may take into consideration in determining the question.

The two Acts under consideration—that is, the originally initiated primary election law and the amendments thereto, which [7] the legislature has declared necessary for the immediate preservation of the public peace and safety—present the divergent views of the people of the state as to the policy to be employed in the holding of primary elections, the people having provided for an "open" primary, and the legislature having changed it to a "closed" primary. Given the opportunity, the people may desire to adopt the policy favored by the legislature. We are told by the record of the legislature that a demand had arisen for such a change, and that great abuses had crept in which threaten "party unity and integrity"; yet the state has gone through at least three general elections, three primary elections for state and county officers, and one for presidential electors, under the old law, without the "immediate necessity" being so crying as to result in action; the legislature has been in regular session three times, and once before, in the year 1918, was in special session, without definite action being taken until the regular session of 1919. At that time, it is true, amendments were passed and referred to the people, the legislature calling for a special election to be held September 2, 1919; but was the special session called because the legislature deemed it necessary to change the primary law before another primary election could be held? Not at all; the reason for the calling of a special election was declared by the legislature to be that it would enable the people "to decide upon such amendments without having the question confused or obscured by being voted upon at a general election, where a multitude of other important questions and the election of many candidates for various offices might tend to preclude a careful consideration of the law so submitted." (Report of special committee.) A question having arisen over the holding of the special election, the committee recommended further action of the legislature, to the end that the primary law

might be amended; for what purpose? Was it for the immediate preservation of the peace and safety of the state? We find the declaration of this purpose also in the report of the committee, which recommends the change "so as to preserve party unity and integrity, and save the expense of holding two primaries in presidential election years, and to correct other manifest imperfections in the law." Again, a matter of policy, difference of opinion or judgment, as to which is the best method of handling elections, were the people to reject the amendments.

Of the policy of the Act we have nothing to say; it is not for us to pass upon, but is a question between the people and the legislature; and certainly the people have not given to the legislature plenary power to determine questions of policy, and thus preclude the mass of the people from passing upon the same.

Three elections had been held under the old primary law; all the present state and county officials, district judges, and members of the supreme court, except as to those appointed to fill vacancies, and every member of the legislature making the declaration above, were nominated for the office to which they were afterward elected. No sudden emergency, no extraordinary event, no immediate necessity arose between the adjournment of the regular and the convening of the special session of the legislature in 1919. Why, then, the declaration of necessity at the later date? Or, if conditions were the same then as they had been during several years prior thereto, and at the time of the holding of former primary elections, why the necessity at all? Can it be said that under such conditions the legislature was justified in declaring that the delay incident to a referendum would be an immediate menace to the public peace and safety? We think not.

Whether those states which still adhere to the system of vesting all legislative power in the legislature, or those which have adopted the initiative and referendum, and whether, in the latter class, those which have the open primary or the closed primary, have followed the more correct system, is not for us to determine. In this state it is the fundamental law that the people

[8]    may themselves propose legislation, and may refer all Acts passed by the legislative body, suspending the operation of those Acts until the people have had the opportunity to either accept or reject them at the polls, except as to those Acts enumerated in the constitutional amendment; and, as to the particular exception here under consideration, it is clear that the people did not intend that the exception should extend further than to those matters arising out of some unforeseen menace, public calamity, accident, sudden emergency, extraordinary occurrence or unprecedented climatic conditions, rendering immediate action imperative to prevent serious or irreparable injury to the public. It was certainly not the intention of the people, having determined to depart from the policy. of vesting all legislative power in a representative body, and to reserve to themselves the right to pass upon all Acts of the legislature, except as to those necessary for the *immediate* preservation of the public peace, public health, or public safety, to then place in the hands of the legislature a weapon to defeat and destroy that power so reserved and to nullify the constitutional reservation thereof.

In considering the Act before us we are apt to think only of the Act of the legislature, and forget that we are construing the Act of the people, the constitutional amendment providing for the initiative and referendum, and that the authority of the legislature to pass Acts without subjecting them to the referendum is subordinate to the greater question of the right of the people to refer all Acts, unless they come within that classification of subjects on which the public interest requires immediate action. Therefore the rules of constitutional and statutory construction apply primarily to the constitutional provision under discussion, and, if they conflict with the application of the rules to the Act under consideration, the latter must give way to the former. For example: In construing an Act the intention of the law-making body should be ascertained and given effect; in this instance, the intention of what law-making body? The answer is, the intention of the sovereign people in

the enactment and adoption of the constitutional amendment providing for the initiative and referendum.

To hold that the courts are powerless to act, or to hold that, having assumed authority, they can go no further than to inquire as to whether, from the face of the Act, it appears that "it is inevitable that the Act does not fall within the classification," is to thwart the intention of the people in the adoption of the initiative and referendum amendment, and to declare that the legislature, created by the people, is more powerful and entitled to greater consideration at the hands of the courts than its creator.

If we adopt the Michigan rule strictly, as declared by Justice Brooke and approved by a divided court in that state, we might as well go all the way, and adopt the Oregon rule; for we may apply that test to nine out of every ten enactments of the legislature in either regular or special session, and we must then declare that "we cannot say that it is inevitable that the Act does not fall within the classification." Applying that test, we are but testing the necessity of the enactment under any circumstances, not the *immediate* necessity, required to warrant the extraordinary action preventing referendum to the people.

Applying the rule contended for to its logical conclusion, the interpretation becomes absurd. As illustrative of the lengths to which a legislature might go, if the courts are not permitted to review their action, we wish to quote from *State* v. *Crawford, supra,* where, after stating that, of the 273 Acts of the legislative assembly of 1914, 64 were passed with the emergency clause attached, the writer continues: "As the Laws of 1917 have not yet been published, I cannot give so definite a statement regarding the emergency clauses—many of them are framed under section 67, and others under the peace, health and safety section. Thus, the Sabbath bill declares it necessary for the peace, health and safety that the bill should take effect and be in force from and after its passage. A bill appropriating $1,500 for railroad commissioners declares it necessary for the peace, health and safety; and so of a bill appropriating a few dollars for the school

of mines; and so of a bill taking private property to lay out a highway. And a bill appropriating $75 expense on a bust of Abraham Lincoln is declared necessary for the public peace, health and safety.''

. Clearly the Act in question, stripped of the superfluous **[9]** declaration of the legislature, contains nothing to warrant the assumption that it is necessary for the *immediate* preservation of either the peace or safety of the state; nor is there anything in the history of the legislation, the contemporaneous declarations of the legislature, the purpose of the Act, or the evils sought to be remedied, showing a fact condition justifying either the legislature or the court from withdrawing the Act from consideration of the people.

Under our system of government the people rule, and that rule is by the majority; it is the duty of the minority to bow to the edict of the majority in matters of policy and procedure. To say that the Act must stand without submission to the people, out of fear that they will not adopt the amendments, is to overthrow the rule of the majority and substitute that of the minority.

We find that the Act amending the primary election law does not come within the purview of the exception, and is subject to the referendum as provided by the constitutional provision; and therefore the judgment of the lower court is reversed, the writ of prohibition set aside, and the cause is remanded, with direction to dismiss the proceeding.

MR. JUSTICE HURLY and MR. JUSTICE COOPER concur.

MR. JUSTICE HOLLOWAY: I dissent. While it is incumbent upon this court to maintain the referendum amendment to our Constitution in its utmost vigor, the referendum itself is not all inclusive. In adopting it the people particularly excepted from its operation ''laws necessary for the immediate preservation of the public peace, health and safety,'' and this exception is as vital a part of the Constitution as is the referendum itself,

and to give full force and meaning to the exception is a duty as imperative as any other imposed upon this court. Whether the Act in question comes within the exception, and is therefore not subject to the referendum, depends upon the answer to two questions: (1) Does the subject matter of the Act bear any reasonable relationship to the public peace or safety? and (2) did there exist such an emergency as rendered it necessary that the Act be effective immediately? The first is a question of law; the second a question of fact. The first involves the essential element of an exercise of legislative power; the second involves the exercise of legislative discretion.

1. Neither reason nor authority supports the view that the terms "public peace," "health" and "safety" have to do only with extraordinary occurrences arising out of public calamity, such as insurrection, pestilence, invasion or rebellion. In *Mugler* v. *Kansas*, 123 U. S. 623, 662, 31 L. Ed. 205, 8 Sup. Ct. Rep. 273, 297 [see, also, Rose's U. S. Notes], the supreme court of the United States said: "We cannot shut out of view the fact, within the knowledge of all, that the public health, the public morals, and the public safety may be endangered by the general use of intoxicating drinks."

Throughout the legislative history of Montana, from its organization as a territory to the present time, the term "public peace" has been used as synonymous with good order in society; to denote quiet, and freedom from agitation or disturbance. (6 Words & Phrases, 5806.) "Public safety" means public security, and relates to matters affecting the stability and orderly and efficient administration of government, and the general welfare of the people as indicated in the *Mugler Case*, above.

There is no mathematical rule by which to determine whether election laws do or do not affect the public peace or safety; but I undertake to say that no other subjects are more intimately connected with the public peace and security than honesty and integrity in politics, which are sought to be secured by our election laws. But if there is any reasonable doubt, however, as to whether the Act in question bears a real or substantial relation

to the public peace or safety, the court should not interfere to thwart the legislative will. Every reasonable intendment should be taken in favor of the propriety of legislative action; and it is only when a statute purporting to have been enacted to protect the public peace or safety does not touch either of those objects, or is a palpable invasion of rights secured by the Constitution, that the courts may interfere. These rules are elementary, and arise of necessity from the relationship existing between the co-ordinate branches of our government. (*Mugler* v. *Kansas,* above; *Attorney General* v. *Lindsay,* 178 Mich. 524, 145 N. W. 98; *State ex rel. Case* v. *Howell,* 85 Wash. 281, 147 Pac. 1162; *State* v. *Moore,* 76 Ark. 197, 70 L. R. A. 671, 88 S. W. 881; *State* v. *Whisman,* 36 S. D. 260, L. R. A. 1917B, 1, 154 N. W. 707.)

The legislature of this state possesses plenary law-making power, except in so far as it is limited by the state Constitution and by the supreme law of the land (*State ex rel. Evans* v. *Stewart,* 53 Mont. 18, 161 Pac. 309); and this rule was not affected in the least by the adoption of the initiative and referendum amendment. As a corollary of this is the rule that a statute will not be declared unconstitutional unless its nullity is placed beyond reasonable doubt. (*State ex rel. Hay* v. *Alderson,* 49 Mont. 387, Ann. Cas. 1916B, 39, 142 Pac. 210.)

It cannot be said that the Act in question bears no reasonable relationship to the public peace or safety, and the effect of the majority opinion is to render the exception to the referendum amendment a dead letter.

2. Whether an emergency existed which made it necessary that the Act should be effective immediately involves only a question of fact; and it is elementary that whenever the right to enact a particular law depends upon the existence of facts, it will be presumed that the legislature, in the exercise of its appropriate functions, found the facts, and no authority is conferred upon the courts to consider evidence to impeach the legislature's findings. (*Stevenson* v. *Colgan,* 91 Cal. 649, 25 Am. St. Rep.

230, 14 L. R. A. 459, 27 Pac. 1089, and numerous cases cited in the note to this case reported in 14 L. R. A. 459.)

The pronouncement by the majority that the finding that an emergency existed is "the unwarranted declaration of the legislature" rests only on the bare *ipse dixit.*

It is said that the "facts are controlling and not the declaration of the legislature," and the controversy is determined as one of fact; but the conclusion is made to depend upon only such evidence as is furnished by the documents referred to.   Whatever other evidence may have been before the legislature to justify its finding that an emergency existed is not known to this court, and, from the very nature of the case, could not be known.

Conceding, for the sake of argument, that in this instance the court may consider extraneous matters, it is, to say the least, a most extraordinary proceeding to determine the controversy upon a portion of the evidence only.

Mr. CHIEF JUSTICE BRANTLY: I concur in the dissenting opinion of MR. JUSTICE HOLLOWAY.