STATE EX REL. EVANS, RELATOR, *v.* STEWART, GOVERNOR, ET AL., RESPONDENTS.

(No. 3,940.)

(Submitted October 16, 1916. Decided November 13, 1916.)

[161 Pac. 309.]

*Farm Loan Act—Constitution—Statutory Construction—En-*
*abling Act—School Funds—Investment—Duty of State Land*
*Board—Implied Powers—Counties—Loaning Credit.*

Statutes—Initiative—Enactment—Legislature—Constitution.
1.   Statutes enacted by the people directly under the initiative are of equal dignity with those passed by the legislative assembly and approved by the governor; in the enactment of the former the provisions of the state Constitution can no more be transgressed than in that of the latter.

[As to construction of initiative or referendum provisions in Constitution, statute or municipal charter, see note in Ann. Cas. 1916B, 375.]

Same—Legislative Power—Constitution.
2.   The state legislature possesses plenary legislative power, except as limited by the Constitution of the United States, the treaties made and statutes enacted pursuant thereof, and by the Constitution of the state.

Farm Loan Act—Validity—Constitution—Enabling Act.
3.   The Farm Loan Act (Laws 1915, p. 486), so far as it provides (secs. 1, 2, 5) a method of procedure under which the state board of land commissioners may invest common school and other specified state funds in first mortgages on good, improved farm lands in the state, and for foreclosure thereof in case of default in the payment of interest thereon, *held* proof against attack on constitutional ground, and not to conflict with the Enabling Act.

Same—State Funds—Investment—Power of Legislature.
4.   Since the Constitution makes no reference to the investment of the reform school, deaf and dumb asylum and capitol building funds, the legislature could prescribe such regulations as it saw fit touching that subject.

Same.
5.   Under its power referred to in paragraph 4 above, that conferred by section 12, Article XI, of the Constitution with relation to funds belonging to the higher educational institutions, which is to be exercised under such regulations "as may be prescribed by law," and that contained in section 3, of the same Article, as to the permanent public school funds to be invested "under the restrictions to be provided by law," the legislature could in the Farm Loan Act, properly exclude county, city and town bonds, as well as warrants and school district bonds not constituting the only outstanding issue, from the list of securities available for the investment of such funds.

Statutes—Power of Legislature—Constitutional Limitations.

6. The authority of the legislature, otherwise plenary, will not be held circumscribed by implication; but one who seeks to limit it must be able to point out the particular provisions of the Constitution which contains the limitation in clear terms.

Farm Loan Act—Investment of State Funds—Duty of State Board of Land Commissioners.

7. *Held*, that the state board of land commissioners must, in the investment of the funds mentioned in the Farm Loan Act, after having given preference to the public securities enumerated, employ the residue in the other securities named, including first mortgages upon *good, improved farm land in the state.*

Same—State Board of Land Commissioners—Implied Powers.

8. Failure of the Farm Loan Act to provide the working details of the plan *held* valid (see paragraph 3 above), is not sufficient to declare it invalid, since whatever authority is necessary in the state land board to execute the commands of the Act is, in the absence of specific direction, conferred by implication, matters of detail—such as the fixing of the rate of interest, *etc.*—being left to the wide discretion of the board for control by appropriate rules or regulations.

Statutes—Validity—How Determined.

9. The validity of an Act called in question is to be determined, not only by what is certain to be done, but by what may be done, under it.

Farm Loan Act—Invalid Provisions—Counties—Loaning Credit.

10. *Held*, that that portion of the Farm Loan Act which seeks to commit to the several counties exclusive authority to loan the funds mentioned therein on farm mortgage security, each county being constituted a statutory guarantor of loans made, any loss to be repaid out of its common revenues, is repugnant to constitutional provisions (Const., Art. XI, secs. 3, 12; Art. XII, sec. 11; Art. XIII, secs. 1, 5), and that since these provisions apparently formed an inducement to the legislature to provide this method of making farm loans, the plan is inoperative.

Statutory Construction—Rule.

11. In construing a statute, the court must, if possible, ascertain and carry into effect the intention of the legislature, which must be gathered from the terms of the statute when considered in the light of surrounding circumstances.

Same—Farm Loan Act—What Part Enforceable.

12. Under the rule that if, after disregarding the unconstitutional portion of an Act, the remainder is complete in itself and capable of being executed in accordance with the apparent legislative intent, it will be sustained, *held* that the Farm Loan Act, so far as declared valid (see paragraph 3 above), is complete and independent of that part of the Act rejected (see paragraph 10 above), and therefore enforceable.

Original application by the State on the relation of Chas. E. Evans, against Samuel V. Stewart, Governor, and others, as members of the State Board of Land Commissioners, and F. C. Roosevelt, County Auditor of Cascade County, Montana. Writ granted.

*Messrs. W. D. Rankin, A. H. Angstman* and *C. F. Holt,* for Relator, submitted a brief; *Mr. Rankin* argued the cause orally.

*Mr. Joseph B. Poindexter,* Attorney General, and *Wm. H. Poorman,* Assistant Attorney General, for Respondents, submitted a brief; *Mr. Poorman* argued the cause orally.

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

At the general election in 1914 the people of this state, acting under the authority reserved to them in section 1, Article V, of the Constitution, adopted by the initiative a statute familiarly known as the Farm Loan Act (Laws 1915, p. 486). Because the state board of land commissioners (for brevity designated the board) failed and refused to perform certain duties devolved upon it by the Act in question, and failed and refused to receive or consider an application for a loan on improved farm lands within this state, made by Charles Evert Evans, this proceeding in *mandamus* was instituted. In defense of its action the board insists that the statute is: (1) Unconstitutional and void in whole or in part, and (2) in any event impossible of administration.

No distinction is to be made between a statute enacted by the [1] people directly, and one enacted by the legislative assembly with the approval of the governor. The result is the same in either case. In this instance the people performed the function of the legislature, and for convenience will be referred to as such.

We enter upon our consideration of the questions involved, with [2] the fundamental principle established that the legislature of this state possesses plenary legislative power and authority, except in so far as it is limited by the Constitution of the United States, the treaties made and statutes enacted pursuant thereof, and by the Constitution of this state. (*In re Pomeroy,* 51 Mont. 119, 151 Pac. 333.)

The Act does not transgress any provision of the Constitution [3] of the United States, and no treaty right is involved; but

it is insisted that it conflicts with the Enabling Act and with several provisions of the Constitution of this state. Section 1 provides that the permanent common school fund and the other permanent educational, charitable, and penal institution funds shall be invested by the state board of land commissioners in: (a) Certain school district bonds; (b) in bonds of this state; (c) in bonds of the United States; (d) in certain state warrants; (e) in capitol building bonds of this state; (f) in irrigation district bonds; and (g) in first mortgages on good, improved farm lands of this state. Section 2 provides that applications for farm loans shall be filled by the board as rapidly as possible and in the order in which they are received. The same section contains a proviso under the terms of which there may be a distribution of certain of these funds among the several counties and loans upon farm lands, made directly by the counties. It is to this latter portion of the statute that the principal attack is directed.

Counsel for the board assume in the first instance that the Act in question provides but a single plan for loaning these funds upon farm lands, and upon that assumption condemn the entire measure. The assumption is unwarranted. The statute in very clear terms provides two distinct plans of procedure, one of which we shall designate the "primary" and the other the "contingent" plan.

1. *The Primary Plan.* Sections 1 and 2 above impose upon the board the duty to invest the specified funds in the securities enumerated therein, including the farm mortgages. Section 5 commands the board and the attorney general to prepare necessary blank forms for applications and for mortgages; each mortgage form to "contain a provision that default in the payment of interest thereon at any time for a period of thirty days after the same shall become due, shall cause the whole principal and interest on said mortgage to become at once due and payable, and said mortgage may be foreclosed in the manner provided by law." This completes the primary plan, and the statute, in so far as it provides this plan of procedure, is proof against any attack made upon it. It does not conflict in the least with any

provision of the Enabling Act. By that Act the federal government made generous grants of public lands and other property to this state for the benefit of: (a) The common schools; (b) the state university; (c) the agricultural college; (d) the state normal school; (e) the school of mines; (f) the reform school; (g) the deaf and dumb asylum; (h) the capitol building; and (i) the penitentiary.

With respect to the lands granted for common school purposes, the Enabling Act fixes a minimum sale price and declares that the proceeds from such sales, together with five per cent of the proceeds from the sales of public lands in the state, shall constitute a permanent school fund the interest from which only shall be expended. It also provides that the lands granted may be leased under regulations prescribed by the legislature of the state, with a limitation upon the term of any such lease and upon the quantity which may be let to any individual, company or corporation. (Secs. 11 and 13.) Of the lands granted for university purposes, it declares that they shall not be sold for less than $10 per acre, but may be leased in the same manner as provided in section 11. With reference to the grants for capitol building and penitentiary purposes, it prescribes no restrictions or regulations whatever. (Secs. 12 and 15.) The only limitation imposed with reference to the other grants enumerated above is that: ''The lands granted by this section shall be held, appropriated, and disposed of exclusively for the purposes herein mentioned, in such manner as the legislatures of the respective states may severally provide.'' It will thus be seen that the Enabling Act does not attempt to regulate the manner in which the permanent funds derived from these grants shall be invested; and, as the Farm Loan Act deals only with the investment of those funds, no possible conflict can be discovered between the two Acts.

Section 1 of the Farm Loan Act omits from the list of [4, 5] securities available for the investment of permanent public funds county, city and town bonds and warrants and school district bonds, which do not constitute the only outstanding issue.

Whether this omission was the result of inadvertence or design is not material here; but, because of the apparent attempt at discrimination, it is insisted that the section is in conflict with the provisions of section 3, Article XI, of the Constitution. Section 2, Article XI, defines public school funds. Section 12 of the same Article deals with the permanent funds belonging to the higher educational institutions, the university, agricultural college, school of mines and normal. There is still a third group made up of the permanent funds belonging to the reform school, deaf and dumb asylum and capitol building. The Constitution makes no reference whatever to the investment of the funds belonging to this last group, and therefore the legislature was left free to prescribe such regulations as might seem fit and proper. With reference to the higher educational institution funds constituting the second group, the mandate of the Constitution is that they shall be invested under such regulations as "may be prescribed by law." (Sec. 12, Art. XI.) Clearly, then, it was within the power of the legislature to make the discrimination contained in section 1 of the Farm Loan Act, and to exclude certain securities from the list available for the investment of funds belonging to the second and third groups above.

But what, if any, authority has the legislature over the investment of the public school funds constituting the first group? Section 3, Article XI—the only constitutional provision touching the subject—goes no further than to declare that: They shall "be invested, so far as possible, in public securities within the state, including school district bonds issued for the erection of school buildings, under the restrictions to be provided by law." This concluding clause must be given meaning. The framers of our Constitution were discriminating in their choice and use of language. They apparently experienced no difficulty in choosing apt words to express the particular shade of meaning which they intended to attach to any provision; and therefore, when they employed the expression "under the restrictions to be provided by law," we must assume that they meant to

have that language construed according to its ordinary meaning. "Restriction" means: "The act of restraining or the state of being restrained; limitation; confinement within bounds; that which restricts; a restraint, reservation, reserve." (Century Dictionary.) "That which restricts; a limitation; a restraint." (Webster's Internat. Dictionary.) "Limitation or confinement within bounds." (7 Words and Phrases, 6187.) "Restrict" means: "To prevent (a person or thing) from passing a certain limit in any kind of action; limit; restrain. To attach limitations to (a proposition or conception) so that it shall not apply to all the subjects to which it would otherwise seem to apply." (Century.) "To restrain within bounds; to limit; to confine." (Webster.) "To restrain within bounds; to limit; to confine." (4 Words and Phrases, 2d Ser., 364.) Viewed in the light of these definitions expressing the common understanding of the term "restriction," we think it must be held to have been the intention of the framers of the Constitution in drafting section 3, Article XI, and of the people in adopting it, that while the legislature cannot proscribe all securities or all school district bonds, it may classify such securities and include one class and exclude another. It may require the board to invest in state bonds and warrants, and forbid it to invest in county, city or town bonds or warrants. It may include in the favored class school district bonds constituting an only outstanding issue and exclude the bonds of a school district which do not constitute the only issue of the particular district. From the fact that public securities are mentioned specifically, it was doubtless intended that, when the legislature had prescribed the restrictions contemplated in section 3, such public securities thus hedged about shall be given preference in the employment of the public school funds, but further than this the section does not go.

We cannot subscribe to the doctrine that the legislature may provide restrictions for the investment of only such portion of the public school funds as may be invested in public securities, and that the remaining portion must lie idle, or, at best, be deposited under the provisions of section 14, Article XII. The

language of section 3, Article XI, if standing alone, does not require such construction, and when read in connection with other provisions of the Constitution, particularly the terms of section 12 of the same Article, the purpose to confide to the lawmakers a wide discretion in the investment of all permanent [6] school funds is apparent.  The authority of the legislature, otherwise plenary, will not be held to be circumscribed by mere implication.  He who seeks to limit the power of the lawmakers must be able to point out the particular provision of the Constitution which contains the limitation expressed in no uncertain terms.

Our conclusion upon this branch of the case is that the board, [7] after having given preference to the public securities enumerated, in the investment of the *public school funds,* is charged with the duty to employ the residue of those funds and all the permanent funds belonging to the higher educational institutions and to the reform school, deaf and dumb asylum, and capitol building in the other securities named, including first mortgages upon good, improved farm land in this state. This construction harmonizes section 1 of the Act with section 3, Article XI, of the Constitution, and leaves intact a complete, workable statute, absolved from any of the objections lodged against this plan.

It is no argument against the Act that it fails to provide for [8] all the working details of this primary plan.  It is an elementary rule of law that: "The grant of a specific power or the imposition of a definite duty confers, by implication, authority to do whatever is necessary to execute the power or perform the duty." (36 Cyc. 1113.)  By sections 1 and 2 of the Farm Loan Act the specific power is conferred, and the specific duty is enjoined upon the board to invest the public funds designated therein, in the securities enumerated, including farm mortgages, and whatever authority is necessary to execute that power and perform that duty is conferred by implication, and matters of detail are left to the board for control by appropriate rules or regulations.

While the statute declares that loans made by the several counties shall bear interest at six per cent per annum, no such restriction is laid upon the board. Under the law in force at the time the Farm Loan Act was adopted, there was conferred upon the board a very wide discretion in investing these public funds. The details of such investments were not covered by specific legislation, and yet it is a part of the history of the state that the board experienced no difficulty in making investments in public securities offered by the state, by the several counties and by municipalities in the state. The same wide latitude in matters of procedure is retained by the board under this Act. It seeks to classify public securities and to designate such of them as may be employed hereafter for the investment of these funds to utilize the funds to a much greater extent than heretofore, and to place the agricultural class in a more advantageous position toward the money market by including farm mortgages as available securities for loans. Under the former statutes the board could invest in one class of public securities bearing five per cent interest, and in another bearing four per cent or less. It could accept one issue and decline another. It could go into the market and bid as a private individual upon offered public securities of the classes mentioned, or it could waive its right to bid. So likewise it may now exact six per cent for loans made upon farm mortgages, or it may accept a lower rate if in the exercise of a wise discretion it deems it for the best interest of the state to do so; for the purpose of the law as declared in the title and body of the Act is to secure the continuous, safe investment of these public funds, and to the wisdom and integrity of the board are confided all matters of detail essential to the execution of the trust in conformity with the spirit of the Act.

2. *The Contingent Plan.* That it was not the intention of the Farm Loan Act to deprive the board of all control over these funds and to commit to the several counties exclusive authority to loan on farm mortgage security in the first instance is made as certain as plain, terse English can ever be made to

express an idea.  Primarily the investment of the funds in farm
mortgages is intrusted to the board by sections 1 and 2 of the
Act, and the board is commanded to make the loans in the order
in which the applications are received by it.  It was doubtless
realized, however, that the contingency might arise in which the
board would find itself unable to employ all of these funds avail-
able for investment in public securities and farm mortgages, and
for the purpose of supplementing the primary plan, and, by
bringing the borrower and lender into closer contact, encourage
the utmost use of these funds by qualified land owners who
might seek long-time loans at an attractive rate of interest, this
proviso was added to section 2: "Provided, however, that if
enough of such moneys remain on hand in the state treasury un-
called for, to warrant them doing so, the state board of land
commissioners shall divide such moneys among the organized
counties of the state, in proportion to the population, as nearly
as may be, subject to the following provisions."  Then follow
the provisions for loaning such residue by the several counties
in the event that the contingency arises and the residue on hand
is sufficient to warrant the board in making a division of it.
There may never be any funds for distribution.  The board
may be able to keep all of the funds securely and continuously
invested in public securities and farm mortgages.  The contin-
gency provided for in section 2 may never arise, and yet it may
[9]  arise at any time, and the validity of the Act in so far as
it provides for this contingent plan is to be tested, not by what
is certain to be done under it, but by what may be done under it.
(*State ex rel. Holliday* v. *O'Leary,* 43 Mont. 157, 115 Pac. 204.)

Whenever the contingency contemplated actually arises, the
apportionment and distribution of such residue is to be made
among the several counties according to population as nearly as
may be done.  Applications for loans are to be made to the
county auditor (or, if there be no auditor, to the county clerk);
the county attorney then examines the abstracts of title; the
county commissioners appraise the lands offered as security,
and loans may be made directly by the county, but the mort-

gages securing them must run to the state. No loan can be made upon land appraised at less than $10 per acre, no loan may exceed two-fifths of the appraised value of the security offered, and not more than $5,000 shall be loaned to any one individual, association or corporation.

Section 8 provides that, if any county receiving its distributive share of these funds is unable to loan them after giving the required notice, it shall return such funds to the board, with interest thereon for sixty days.

Section 9 provides that, if a borrower fails to meet the requirements of his obligation, the county attorney shall foreclose the mortgage. The same section then proceeds: "If no other person shall bid the full amount due upon said mortgage upon the foreclosure sale of the same, with the cost and expenses of the foreclosure and sale, the county attorney or county auditor shall bid in the land in the name of the county for the amount due and all costs and expenses incurred, and such county shall at once pay to the state board of land commissioners such full amount due and interest out of the general fund of the county, and if the same is not redeemed, as provided by law, the sheriff's deed shall be made to the county and the county shall thereby become the owner of said land."

By section 12 each county is made responsible and accountable for the principal and interest of all moneys received by it, and in case of loss such county shall, out of its common revenues, repay the same to the board.

Notwithstanding such funds are distributed to the several counties, and the board releases all control over them, and the counties are charged with the duty to loan or return them with interest, the state nevertheless retains title to such funds. They belong to the state in the sense that they are realized out of the grants to the state by the federal government. (*County of Des Moines* v. *Harker,* 34 Iowa, 84.)

By sections 8, 9 and 12 of the Farm Loan Act every county is made primarily liable for the funds received by it. It is required by section 8 to return the funds if no loans are made, in

which event it must pay interest for sixty days out of its revenues raised by general taxation, though it receives no benefit from the transaction whatever. By section 9 it is constituted a statutory guarantor of every loan made by it. If the borrower fails to pay principal or interest, the county is ultimately liable for the loss or deficiency, notwithstanding the Constitution in section 1, Article XIII, provides: "Neither the state, nor any county, city, town, municipality, nor other subdivision of the state shall ever give or loan its credit in aid of, or make any donation or grant, by subsidy or otherwise, to any individual, association or corporation, or become a subscriber to, or a shareholder in, any company or corporation, * * * except as to such ownership as may accrue to the state by operation or provision of law."

The primary liability for the integrity of the funds distributed is sought to be fastened upon the counties by this Act, while the Constitution imposes such liability upon the state. (Sections 3 and 12, Article XI.) By the terms of this Act a county is compelled to pay out of its general revenues raised by taxation all the expense of operating under this plan, including interest on funds not loaned, and the principal and interest of loans foreclosed [in the absence of another purchaser at the foreclosure sale], excepting only the cost of abstract and recording fee; and if the funds to make these payments are not on hand in the county treasury, the county must perforce issue its warrant or evidence of indebtedness, and all this without reference to its outstanding obligations. Section 5, Article XIII, of the Constitution limits the indebtedness which a county may incur for any purposes whatever to an amount not exceeding five per cent of the value of its taxable property; but the Act in question makes no distinction between the county which has reached the limit of indebtedness and the one which has not. It attempts to impose this additional burden upon all alike, doubtless to avoid the charge that the measure is obnoxious class legislation. The borrower who secures his loan from

the county becomes indebted to the state, not to the county. His obligation runs to the state and his mortgage is made to the state; but by this Act the county is compelled to raise by taxation money to extinguish the private debt of a delinquent borrower to the state, notwithstanding the Constitution forbids it to do so.

Whatever may be said of other provisions constituting this plan—for instance, of the provision of section 2 requiring the funds to be distributed to the several counties according to population, without any means available to the board for ascertaining the population, or of the provision of section 3 requiring the board to relinquish control of these funds without any additional security from the county treasurer who receives the funds for the county, or of the provision of section 2, subdivision (c), requiring the county auditor to give public notice of the funds on hand available for farm loans, and the apparently contradictory provision of section 6, which requires such notice to be given by the county commissioners, or of the provision of section 10, which requires the county in its own name to give a release and satisfaction for a *debt due to the state* and paid by the borrower, or of the provision of section 6 (a), which attempts to impose upon a judicial officer purely ministerial duties—this much is certain: Sections 9 and 12 violate the plain mandates of the Constitution.

It is beyond the power of legislation to compel a county, or the several counties, to assume a burden imposed upon the state itself by terms of the Constitution which are mandatory and prohibitory.

A county cannot be compelled to loan its credit in aid of an individual or to make good the loss incurred by a delinquent borrower's failure to discharge his obligation to the state.

The county which has already reached the constitutional limit of indebtedness cannot be burdened by further liabilities of this character imposed by statute, or at all, without an amendment to the Constitution itself.

Taxes imposed and collected by a county can be expended only for public purposes. (Const., sec. 11, Art. XII.) They cannot be diverted to liquidate the debt of a private individual.

Whether the invalid provisions of sections 9 and 12 shall operate to defeat the contingent plan depends upon the answer to the inquiry: Are those provisions so intimately related to the remaining portions of the statute creating the plan that it may be said fairly they were an inducement to the lawmaker to provide the plan?

In construing a statute the court must, if possible, ascertain [11] and carry into effect the intention of the legislature enacting it (*Power* v. *Board of Co. Commrs.*, 7 Mont. 82, 14 Pac. 658) ; and such intention is to be gathered from the terms of the statute, when considered in the light of surrounding circumstances. (*Jay* v. *School District No. 1*, 24 Mont. 219, 61 Pac. 250.) In so far as we are able to ascertain the intention of the lawmakers in providing for this contingent plan, it would seem reasonably certain that the provisions requiring the county to be responsible and accountable for the funds received by it and to guarantee each loan made by it were intended to constitute the mainstay or principal support of the entire plan. So long as the funds are committed to the custody of the board for investment, the state guarantees their integrity under the provisions of the Enabling Act and the Constitution requiring it to do so; but when by the terms of this plan the board is required to relinquish entire control and the county, through its officers, assumes exclusive management, the guaranty of the funds by the county was apparently deemed necessary to their safety and security and without which the plan would never have been devised. Under this view, the entire plan must be deemed abortive, and the statute, in so far as it provides for it, unconstitutional and void.

The people of this state, acting as a legislative body, can no more transgress the provisions of the state Constitution than can their representatives in the legislative assembly. The terms

of the Constitution can be changed or modified only in the manner indicated in Article XIX of the Constitution.

But it does not follow that because this contingent plan must **[12]** be disregarded the entire Act is invalidated. The respective portions of the Act providing the two plans are entirely distinct; that is to say, the provisions constituting the primary plan are in no wise dependent for their vitality upon the remainder of the Act. The primary plan is complete in itself, and will not be affected by a disregard of the remaining portions of the Act. The rule applicable here was stated by this court in *Dunn* v. *City of Great Falls,* 13 Mont. 58, 31 Pac. 1017, as follows: "If, when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must be sustained." (*Hill* v. *Rae,* 52 Mont. 378, 158 Pac. 826.)

Under the views herein expressed, the county auditor of Cascade county is not a necessary or proper party to this proceeding, and he is dismissed from further consideration.

The peremptory writ will issue directed to the remaining defendants constituting the state board of land commissioners, commanding them to receive and consider the application of this relator, and to take such further steps as will render effective the primary plan of the Farm Loan Act as indicated herein.

MR. JUSTICE SANNER concurs.

MR. CHIEF JUSTICE BRANTLY: While I did not hear the argument in this case, I have examined carefully the provisions of the statute and the sections of the Constitution by which its validity must be determined. I am satisfied that MR. JUSTICE HOLLOWAY has stated the only conclusion permissible, and therefore concur therein.