TOOLE COUNTY IRRIGATION DISTRICT, Respondent, *v.*
STATE et al., Appellants.

(No. 7,666.)
(Submitted March 24, 1937.   Decided April 17, 1937.)
[67 Pac. (2d) 989.]

*Mr. Harrison J. Freebourn,* Attorney General, and *Mr. C. J. Dousman,* for Appellants, submitted a brief; *Mr. Dousman* argued the cause orally.

422

*Mr. Louis P. Donovan,* for Respondent, submitted a brief, and argued the cause orally.

426

MR. JUSTICE STEWART delivered the opinion of the court.

This is an appeal from a judgment of the district court of Toole county.

The plaintiff and respondent, an irrigation district, brought action against the State of Montana, the state board of land commissioners, and the county treasurer of Toole county. The purpose of the action was to have the court declare certain levies of irrigation assessments valid liens upon certain lands

now owned by the State of Montana, and that plaintiff has a right to collect the assessments from the state. Defendants, appellants, filed a demurrer to the complaint on the ground that it did not state a cause of action. The court overruled the demurrer. Defendants then filed an answer, to which the plaintiff demurred on the ground that the facts pleaded did not constitute a defense. The court sustained this demurrer. Defendants elected to file no further pleadings and allowed a declaratory judgment to be entered against them. (See sec. 9835.1 et seq., Rev. Codes.)

From the complaint it appears that the Toole County Irrigation District is now, and ever since the 4th of September, 1919, has been, a public corporation duly organized and created in accordance with the provisions of Chapter 146, Laws of 1909, and Acts amendatory thereof; that an area consisting of 282,191.63 acres was included within the boundaries of the district; that at the time of its creation, 10,567.52 acres of this land constituted 40 separate tracts which were owned by certain private individuals, but which were subject to first mortgage liens in favor of the state; that subsequently and prior to the time that the assessments in question were levied, the state had become the title owner of these tracts; that the mortgagors had conveyed their titles to the state by quitclaim deeds to prevent foreclosure by the state; and that the loans secured by them had been made from the state permanent school fund.

The complaint further alleges that between September 4, 1919, and May 13, 1922, the board of commissioners of the irrigation district proceeded with preliminary matters in the construction of the irrigation system, and caused necessary topographical surveys, maps, plans, and profiles to be made under the direction and supervision of an irrigation engineer; that by these preliminaries the district incurred an indebtedness; that the district then issued warrants as authorized by law; that thereafter, for the purpose of taking up these outstanding warrants, it issued and sold funding bonds in the sum of $238,000;

and that bonds in the sum of $111,625 are still outstanding and unpaid. The bonds were to mature in 1930.

In 1926, 1927, and 1928, the district board of commissioners duly adopted resolutions for the levy of special assessments of 20 cents an acre upon all the lands within the district, including the lands so acquired by the State of Montana, for the purpose of creating a sinking fund with which to pay the bonds at maturity. The state refused to pay the assessments so levied against its lands, and the county treasurer subsequently offered them for sale, but there was no bidder. Thereafter Toole county bid in each tract for the amount of tax, penalty, and interest thereon. No tax deed was ever issued and no application therefor has ever been made, because the State of Montana and the state board of land commissioners have at all times asserted that the assessments and levies of taxes on the lands so acquired from the mortgagors after the issuance of the bonds were illegal and invalid; and that these lands now belonging to the state—although included within the irrigation district while in private ownership, but covered by mortgages to the state— were exempt from taxation or assessment.

Upon this statement of facts the district court in its declaratory judgment upheld plaintiff's position that the assessments were good and valid, and constituted a lien on the lands. The parties offered no evidence, and the court therefore based its judgment on the pleadings.

Appellants urge three assignments of error; they resolve themselves into the single question whether or not the court erred in rendering judgment in favor of the plaintiff and against the defendants. We shall consider them all together. In order, however, that it may be understood what statutes the question involves, we shall make a brief review of the provisions which we deem pertinent to a decision.

Our first Irrigation District Act was passed in 1907 (Laws 1907, Chap. 70). Since that time various of its sections have undergone amendment and modification, as well as repeal. With regard to the organization of a district, section 2309, Revised

Codes 1907, provided in effect that within a prospective irriga-
tion district a majority of the holders of title, or evidence of
title, representing a majority of the acreage of the lands, could
propose the organization of such district. This section re-
mained very much the same until 1921, and then section 7166
added some additional provisions concerning co-operation with
the United States under federal reclamation laws. In 1925,
however, the majority of holders requirement was changed to
60 per cent., representing 60 per cent. of the acreage. Another
change—the most significant change so far as the present liti-
gation is concerned—required that when any land sought to be
included in an irrigation district was covered by mortgage or
other lien, the owner thereof had to procure first the written
consent of the mortgagee before proposing the establishment
and organization of such irrigation district. (Laws 1925, Chap.
112, sec. 1.) This is the present status of the law on that point
as now contained in section 7166, Revised Codes. Note that at
the time of the creation of Toole County Irrigation District in
1919, the law required no such permission or consent by the
mortgagee.

No appeal was taken from the judgment of the district court
confirming and ratifying the proceedings of the board of com-
missioners and the issuance of the bonds, and the same there-
fore became final. Furthermore, in 1923 the legislature passed
an Act validating irrigation districts and their acts. This pro-
vision is now contained in section 7231.1, Revised Codes.
Finally, this court decided the case of *Drake* v. *Schoregge,* 85
Mont. 94, 277 Pac. 627, wherein it declared the validity of the
Toole County Irrigation District. Therefore all doubt on that
point is at rest. (See, also, to the same effect, *Tomich* v. *Union
Trust Co.,* (C. C. A.) 31 Fed. (2d) 515.)

The next sections deal with the question of the bonds. The
first one concerns the petition for bonds to provide the neces-
sary funds for the construction of an irrigation system. That
section is now 7210, Revised Codes. Originally, in the Session
Laws of 1909 (sec. 40, Chap. 146), this section provided, among

430

other things, as follows: "Upon the filing of such petition the board of commissioners shall by appropriate order or resolution * * * provide for the levy of a special tax or assessment as in this Act provided on all the lands in the district for the irrigation and benefit of which said district was organized and said bonds are issued, * * * sufficient in amount to pay the interest on and principal of said bonds when due." Five subsequent legislative sessions amended this section, but the language just quoted remained intact. From this history a fair inference would be that it was the intention of the legislature in each instance to include as assessable lands all lands within the district, no exemption having been made of state lands.

The next section, now 7213, Revised Codes, was first enacted as section 43, Chapter 146, Laws of 1909. At that time it read as follows: "All bonds issued hereunder shall be a lien upon all the lands originally or at any time included in the district for the irrigation and benefit of which said irrigation district was organized and said bonds are issued; * * * and all such lands shall be subject to a special tax or assessment for the payment of the interest on and principal of said bonds; and said special tax or assessment shall constitute a first and prior lien on the lands against which levied to the same extent and with like force and effect as taxes levied for state and county purposes." Three legislative assemblies amended this section, but none of the amendments attempted to change the provision just quoted. Through the period of the organization of the Toole County Irrigation District and to the present time this section has been in effect, except that a few necessary additions have been added to provide for liens of bonds where a contract between the district and the United States was involved. Thus it will be observed that at no time, either before or after the date of the organization of this district, did the legislature ever show any intention to consider such bonds as anything but first and prior liens upon all the lands. Equally as interesting is the fact that through its evolution to its present form, the section no-

where makes any exemption with regard to lands to be assessed. (See 19 R. C. L., sec. 192, p. 412; 41 C. J., sec. 461, p. 523.)

Section 7232, Revised Codes, had its origin in the Act of 1909. It deals with the tax, or assessment, to pay bonds and interest. The subsequent amendments made no change in the following particular: "All bonds and the interest thereon issued hereunder  *  *  *  shall be paid by revenue derived from a special tax or assessment levied as hereinafter provided upon all the lands included in the district.  *  *  *  It shall be the duty of the board of commissioners of the district  *  *  *  to provide for the annual levy and collection of a special tax or assessment upon all the lands included in the district."

Next we consider what is now section 7235, which also originated in 1909. So far as is pertinent here, it provided then, as well as in four subsequent amendments, that "the board of commissioners  *  *  *  shall ascertain the total amount required to be raised in that year for the general administrative expenses of the district, including the cost of maintenance and repairs, and the total amount to be raised that year for interest on and principal of the outstanding bonded or other indebtedness of the district  *  *  *  and shall levy against each forty-acre tract  *  *  *  that portion of the said respective total amounts so to be raised which the total irrigable area of any such tract bears to the total irrigable area of the lands in the district."

In our review of these provisions, we have not lost sight of the fact that the state's original interest as mortgagee in some of the lands included within the irrigation district came about as a result of farm loans made from the state's common school fund. We now find it necessary to review briefly the history of the state's authority to make such loans.

Section 1, Article XVII, of our Constitution provides in effect that all the lands of the state which have been or may hereafter be granted to the state by Congress, and certain other lands, shall be public lands of the state to be held in trust for the people, to be disposed of only in the manner provided by law.

Section 2, Article XI, provides that the public school fund of the state shall consist of the proceeds from these lands. Section 3 of the same Article then provides: "Such public school fund shall forever remain inviolate, guaranteed by the state against loss or diversion, to be invested, so far as possible, in public securities within the state, including school district bonds, issued for the erection of school buildings, under the restrictions to be provided by law." Finally, section 12 of the Article imposes the additional restriction that the funds of the State University and all other state institutions of learning shall remain inviolate, invested as provided by law, and guaranteed by the state against loss or diversion.

Charged with knowledge of these constitutional safeguards relating to the school fund, the people of Montana initiated a measure submitted at the 1914 general election and known as " The Farm Loan Law." (Laws 1915, p. 486.) It gave expression to the will of the people with relation to the investment of moneys belonging to the permanent school fund. One of the provisions allowed such funds to be invested in first mortgages on good, improved farm land in the state. The Attorney General held the law unconstitutional and inoperative. With this opinion before him, and also with the knowledge that the people had spoken on the subject, the Governor made specific and pointed recommendations to the legislature in his regular message to the session which convened in 1915. He advised that the assembly enact some suitable legislation to conform to the expressed intent of the people with regard to the investment of the permanent school fund. He carefully and particularly pointed out, and warned concerning, the sacredness of these trust funds, and stressed that their irreducibility would have to be guaranteed by the state and that the Constitution made them inviolate. That assembly passed no further legislation on the subject. Subsequently, in 1916, this court decided the case of *State ex rel. Evans* v. *Stewart*, 53 Mont. 18, 161 Pac. 309, and held that the investment of school funds in farm mortgages was not in violation of the Constitution or the Enabling Act.

The Governor's message to the Fifteenth Legislative Assembly in regular session in 1917 again called the attention of the assembly to the necessity and advisability of drafting additional legislation on the subject of the investment of the state permanent school fund. As in his message to the Fourteenth Legislative Assembly, he again warned the members with regard to the sacredness of the trust fund, the care required to be exercised in dealing with it, and the fact that losses from the fund would have to be made good from other funds of the state if necessary to protect it. The assembly then enacted a complete law on the subject (Chap. 124), and attempted to remedy the deficiencies in the previous Act, particularly in the matter of the administrative details mentioned in *State ex rel. Evans* v. *Stewart,* supra.

To portray a more comprehensive picture of the entire situation, we may with interest now observe what the legislature enacted in 1921. In section 62 of Chapter 153, Laws of 1921, which became section 4014, Revised Codes 1921, it was provided: "The state land board for and on behalf of the state of Montana is hereby empowered to sign a petition for the inclusion of any lands belonging to the state in an irrigation district, and to pay all annual assessments thereon to the treasurer of the county in which the lands are located out of appropriations made by the legislative assembly for such purpose; such payments shall be added each year to the appraised value of the land, and the land shall thereafter be sold for a sum not less than the appraised value, plus all assessments paid to date of sale." Chapter 147, section 11, Session Laws of 1923, amended this section with regard to the source of payment of the assessments, as follows: "To pay all annual assessments * * * out of the funds of said state land board not otherwise appropriated." The next session made no change in the law, but in 1927, Chapter 60 repealed the section.

The history of this section is important, inasmuch as it shows that, had the land board wished to do so, it could have subjected its lands in an irrigation district to the provisions of the

law and could have participated in the benefits and burdens equally with private landowners of the district. This authority was given to the land board in 1921, at the very time that some of the mortgaged lands here involved composed a part of the Toole County Irrigation District. It appears inconsistent for the state to attempt here to avoid burdens which have indirectly accrued to it, when it is understood that during the period from 1921 to 1927 express legislative authority enabled the state to participate directly in irrigation districts and have its lands subjected to just such burdens of assessment as those here involved.

The first question thus tendered is whether or not state-owned lands included within an irrigation district are subject to assessment. We hold that they are. Section 2, Article XII, of our Constitution provides that "the property of * * * the state * * * shall be exempt from taxation." To like effect is section 1998, Revised Codes.

Irrigation assessments are not taxes within the meaning of this constitutional and statutory exemption. (*Buffalo Rapids Irr. Dist.* v. *Colleran*, 85 Mont. 466, 279 Pac. 369, 372; see, also, *City of Kalispell* v. *School Dist.*, 45 Mont. 221, 122 Pac. 742, 744, Ann. Cas. 1913D, 1101.) In the former case it was held: "An irrigation district is neither supported by appropriation of public funds, by taxation, or by private donation. True, funds for the maintenance and operation of the district are raised by assessments levied against the property within the district, but these levies are in the nature of special assessments for local improvements * * * entirely distinct from general taxes for state, county, school district, and municipal purposes; * * * they may even be levied against public property in spite of the constitutional exemption, * * * and no part of the revenue derived therefrom reaches the coffers of the state or its political subdivisions organized for governmental purposes." (Citing cases.)

In *City of Kalispell* v. *School Dist.*, supra, this court adopted the theory that liability for taxes, of whatever character, is the rule and that exemption is the exception; that one seeking an

exemption has the burden of showing an exception in his favor written in the law in express terms, or clearly implied from the language employed. As was stated in that case: ''It was not the intention of the framers of our Constitution to write into our fundamental law any useless or meaningless phrases; and the very fact that they declared an exemption from taxation in favor of public property is, to say the least, a recognition of the principle that without such express exemption that property would be subject to taxation, along with the property of the private individuals, corporations, and others. If, then, there was necessity for making an express exemption in favor of public property from taxation, strictly speaking, for the stronger reason is it necessary that there should be an express exemption if such property is to be freed from paying for improvements to such property.'' That state property may be assessed for local improvements, see, also, 1 Page & Jones, Taxation by Assessment, sec. 581, p. 957; 25 R. C. L., sec. 31, p. 113; and 8 Brit. Rul. Cas. 196.

Counsel for the state urge that the state lands cannot be sold to satisfy the lien of assessments and that, therefore, the assessment should be held invalid. This view does not impress us. The answer to their contention appears in *City of Kalispell* v. *School Dist., supra;* and 8 British Ruling Cases, 203, very aptly states it as follows: ''In jurisdictions in which the doctrine prevails that public property is liable to assessment unless exempted expressly or by necessary implication, the view that an exemption is to be implied from the fact that the statute under which the special assessment is made provides that it shall be a lien upon the property is rejected, the reply being made that the validity of the assessment does not depend upon the means by which the payment is to be enforced, and if the assessment is valid and the proceeding by foreclosure of the lien is not available because of the character of the property the right will not fail because of failure of a specific remedy, but the courts will invoke any appropriate remedy to meet the exigencies of the particular case.''

436

It is not to be assumed that the state will not find some means to discharge the lawful assessments levied against its property; rather the contrary assumption should be made. As was said in *Hassan* v. *City of Rochester*, 67 N. Y. 528, at page 535: "Although the state cannot be made a party to an action to enforce such a claim and be sued in its sovereign capacity it may be assumed that the state will provide means for the liquidation of assessments imposed by virtue of laws enacted by its legislature, and that as has been frequently done heretofore, appropriations will be made for that purpose." (See, also, *State ex rel. Latimer* v. *Henry*, 28 Wash. 38, 68 Pac. 368.)

We next observe from section 7213, Revised Codes, that the ■ legislature expressly made the issued bonds a first and prior lien on all the lands within the irrigation district. Further, section 7229, Revised Codes 1921, in effect at the time of the bond issue, provided: "Any bonds issued for the payment or redemption of the existing and outstanding warrants of said district shall constitute a lien upon the lands of said district * * * and any special tax or assessment for the payment of the principal and interest of said bonds, shall be a lien upon the lands against which levied." This provision became a part of the bondholders' contract with the district in the same way as if it had been incorporated in the bonds. (*State ex rel. Malott* v. *Board of County Commrs. of Cascade County*, 89 Mont. 37, at page 59, 296 Pac. 1; *State ex rel. Malott* v. *Cascade County*, 94 Mont. 394, 22 Pac. (2d) 811; see, also, sections 7228, Revised Code 1921, and 7232, supra. Since the legislature had provided that the bonds were first and prior liens, and that assessments could be levied upon all the lands within the district, the actual levying of the assessment to satisfy a lien obligation in existence since the sale of the bonds was merely a ministerial function and a matter of arithmetical computation. (*State ex rel. Tipton* v. *Erickson*, 93 Mont. 466, at page 476, 19 Pac. (2d) 227; see, also, *State ex rel. Judd* v. *Cooney*, 97 Mont. 75, 32 Pac. (2d) 851, and cases therein cited.)

The final question with regard to the permanent school fund ██ ██ is whether the assessments in any way tend to reduce illegally this fund by the Constitution made inviolate. We think not. A careful examination of the above-mentioned constitutional provisions relating to the permanent school fund will show that what was done in this case was in accordance with the mandates laid down in those provisions. They declare that the "school fund shall forever remain inviolate, guaranteed by the state against loss or diversion." (Sec. 3, Art. XI.) This does not mean that the state may not invest it, because those same provisions specifically provide that it shall be invested in certain securities and under such regulations as may be prescribed by law.

With the wisdom of those laws relating to farm loans from this fund we are not here concerned. The history of their enactment, as set forth elsewhere in this decision, clearly discloses that the people and the legislature went into the business of making farm loans with "eyes open." They knew of the sacred and inviolate character of the funds from which they were authorizing loans to be made. Their function was to legislate as they saw fit, bearing in mind always that whatever the field of investment, the fund was guaranteed by the state against loss or diversion. Thus they invested over $4,000,000 under the permissive part of the constitutional mandate. (*State ex rel. Evans* v. *Stewart,* supra.) When they had done so, the mandatory duty imposed by the Constitution upon the state to guarantee the fund against loss or diversion came squarely before them.

Aware of its solemn trust, the Twenty-fourth Legislative Assembly in 1935 enacted legislation specifically recognizing the liability of the state and acknowledging its obligation to keep inviolate the public permanent school fund, and its guaranty to protect it against loss or diversion, including loss from investments in state farm loans. (Chap. 127, Laws of 1935, sections 1218.1 et seq., Rev. Codes 1935.) Section 2 of that chapter (Rev. Codes, sec. 1218.2) reads in part as follows: "The state itself

438

hereby assumes and takes over all of such farm mortgage loans now existing as such, * * * and the state hereby promises and agrees to repay to the public school permanent fund the said sum of four million two hundred fifty thousand six hundred twenty-five and 95/100 dollars ($4,250,625.95) * * * from the proceeds of such farm mortgage loans and lands and from such other sources other than that the state general fund as the legislative assembly may provide.'' Section 6 of the chapter (Rev. Codes, sec. 1218.6) specifically authorizes the state board of land commissioners to order paid claims against the state for taxes upon lands under mortgage to the state when it becomes necessary to pay such taxes in order to prevent loss of title to the land. This legislation also set up a farm loan sinking fund for just such an emergency as the present one.

From the foregoing, it clearly appears that the state has taken an unequivocal position in the matter of assuming whatever liability may have accrued from the loaning of the school funds. We have held that the assessments are proper charges against the state. If appropriate means are not available from the fund created by the legislative Act, it is still the obligation of the state, by virtue of the Constitution as well as the legislative declaration, to make the payment from some source. If appropriate funds be not available under the scheme set up by the legislative enactment for that purpose, that does not affect the liability. As was appropriately said in the case of *State Land Board* v. *Davidson,* 147 Or. 504, 34 Pac. (2d) 608, 610: ''Holding that the state land board mortgage is inferior to the bonds of the irrigation district or prior issue and sums levied and assessed for the annual service of such bonds and maintenance is not diverting any part of the irreducible school fund to any other than its constitutional purpose. This does not prevent the legislature from providing other means for keeping the fund intact.'' (See, also, to the same effect, *State ex rel. Latimer* v. *Henry,* supra.) That the mortgage lien of the state was prior in point of time does not alter the soundness of this position. (See *Steinfeld* v. *State,* 37 Ariz. 389, 294 Pac. 834.)

We, therefore, reaffirm what this court said in 1930, in the case of *State ex rel. Malott* v. *Board of County Commrs. of Cascade County,* supra, 89 Mont. 37, at page 93, 296 Pac. 1, 18: "But, if a loan is made of the school funds upon farm lands, the lands are still subject to taxation, and the state of Montana is obliged to protect its loan by the payment of the taxes levied against the land." While these loans were not made upon lands that were school lands at the time, the principle is the same. As long ago as 1922, the attorney general of Montana construed the law as we have attempted to explain it here. (9 Opinions of Attorney General, 430; 10 Opinions of Attorney General, 56; 11 Opinions of Attorney General, 297.)

Judgment affirmed.

MR. CHIEF JUSTICE SANDS and ASSOCIATE JUSTICES ANDERSON, MORRIS and ANGSTMAN concur.