LODGE, PLAINTIFF, *v.* AYERS, GOVERNOR, ET AL., DEFENDANTS.

(No. 7,981.)

(Submitted June 2, 1939. Decided June 15, 1939.)

[91 Pac. (2d) 691.]

*Messrs. Toomey, McFarland & Chapman,* for Plaintiff, submitted a brief; *Mr. E. G. Toomey* argued the cause orally.

*Mr. Harrison J. Freebourn,* Attorney General, *Mr. Enor K. Matson,* Assistant Attorney General, and *Mr. Wesley W. Wertz,* Special Assistant Attorney General, for Defendants, submitted a brief; *Mr. Matson* and *Mr. Wertz* argued the cause orally.

MR. JUSTICE STEWART delivered the opinion of the court.

We are asked to say whether the State Board of Examiners may proceed to refund the outstanding balances of five different issues of Capitol Building Bonds in the aggregate of $632,224.75, under the authority of Chapter 133, Laws of the Twenty-sixth Legislative Assembly, 1939.

The title of the chapter and section 1 thereof are as follows:

"An Act Authorizing the Issuance of Bonds of the State of Montana to Refund Capitol Building Bonds of Said State and Held by the State Board of Land Commissioners, and Providing for the Payment Thereof."

"Section 1. The state board of examiners is hereby authorized and empowered to issue and sell bonds of the State of Montana, payable in lawful money of the United States, in an amount sufficient to pay, refund and redeem all capitol building bonds heretofore issued by the State of Montana and held by the state board of land commissioners as investments of trust funds under the administration of said board. The proceeds from such sale shall be deposited in the treasury of the State of Montana and credited to the 'capitol building refunding bonds sinking and interest fund' and shall be used exclusively for the payment of said outstanding capitol building bonds and interest thereon."

A taxpayer seeks to enjoin the board on several grounds, each of which we shall separately discuss.

The bonds to be refunded are all owned and held by the State Board of Land Commissioners, a constitutional body (sec. 4, Art. XI, Const.), in which is vested the power to handle and control all state lands granted by the federal government for state educational departments and public schools, and with power to invest certain of the proceeds thereof for the benefit of the institution or department for whose support the particular land grant

was made. They represent investments of such trust funds of the public schools, University, Agricultural College, School of Mines, Normal School, and School for the Deaf and Dumb.

The second issue of $418,000 was due May 1, 1939, and in the interest on all issues is over and past due for substantial periods of time.

The first and most important question is: Does the chapter assume to create, and will the proposed action thereunder create, an indebtedness in excess of $100,000 without submission of the proposal therefor to a vote of the people, in contravention of section 2, Article XIII of our Constitution?

The fact that the defaulted obligations sought to be refunded represent investments and present holdings of the State Board of Land Commissioners, that they are trust funds in fact, owned by the schools and other educational departments, was obviously the inspiration for such legislation. The motivating and compelling reason for the specific Act was recognition of the constitutional provision that all such funds are "inviolate and sacred" to the purposes for which designated, and guaranteed by the state against loss or diversion. (Const., Art. XI, secs. 3 and 12.)

The field of investment of these funds is prescribed by the Constitution and by statute. There is no contention that the investments when made and the bonds when purchased by the State Land Board were not proper and legal investments for the trust funds so employed. It seems too plain for quibble that under the explicit wording of the Constitution the defaulted bonds in which the trust funds were invested automatically, but nevertheless certainly, became obligations of the state,—in the beginning perhaps contingent liabilities, but upon subsequent and appropriate recognition by the legislature of loss, that contingency gave way to certainty, and recognized, absolute and liquidated liability came into the transaction. This conclusion is inevitable if purpose and potentiality live in the promise of the people themselves which was solemnly made through the medium of the Constitution to the children and youth of the state as a perpetual guaranty of some measure of educational opportunity.

The legislature recognized that there was imminent loss, and in patriotic spirit invoked the power of the state to redeem the promise and save the situation. It devised a method and set up machinery to make the constitutional guaranty effective; otherwise stated: It proceeded to make good the state-old promise of the people. In doing so it did not create any new state liability or debt.

This is not the first time that such a contingency has arisen. In another instance the legislative assembly took the same unequivocal position in the matter of recognizing the liability accrued from the loaning of school funds on land mortgages. (*Toole County Irr. Dist.* v. *State,* 104 Mont. 420, 67 Pac. (2d) 989, 994.) In that case the following language was used: ''The final question with regard to the permanent school fund is whether the assessments in any way tend to reduce illegally this fund by the Constitution made inviolate. We think not. A careful examination of the above-mentioned constitutional provisions relating to the permanent school fund will show that what was done in this case was in accordance with the mandates laid down in those provisions. They declare that the 'school fund shall forever remain inviolate, guaranteed by the state against loss or diversion.' (Sec. 3, Art. XI.) This does not mean that the State may not invest it, because those same provisions specifically provide that it shall be invested in certain securities and under such regulations as may be prescribed by law. ❋ ❋ ❋ Thus they invested over $4,000,000 under the permissive part of the constitutional mandate. (*State ex rel. Evans* v. *Stewart,* supra [53 Mont. 18, 161 Pac. 309].) When they had done so, the mandatory duty imposed by the Constitution upon the State to guarantee the fund against loss or diversion came squarely before them.''

The investments selected by the State Board of Land Commissioners were certainly within the contemplation of those prescribed by the Constitution. That being so, it would appear idle to require a reference of the question of expenditure to the people for their approval—this for the reason that authorization for such expenditures was already given by the people in the

Constitution. That authority was not equivocal or doubtful. When the guaranty of those funds by the state against loss or diversion was written into the Constitution it meant just what it said. It meant, to paraphrase the matter, that we, the people, may cause the funds to be invested within certain limits, but when they are so limited we must ever have in mind that they are sacred, by ourselves declared inviolate, and, therefore, we must always see to it, whatever the cost may be, that they are fully protected against loss or diversion.

· The funds having been guaranteed, then it follows as the night the day that the investments made thereof must likewise be protected. A loss has occurred by reason of the investments, and the state is simply making good its guaranty. (*State ex rel. Evans* v. *Stewart,* supra; *Schomer* v. *Scott,* 65 S. D. 353, 274, N. W. 556; *In re State Bonds,* 7 S. D. 42, 63 N. W. 223.)

It is well established that the issuance of bonds to pay outstanding obligations does not *create* a debt within the meaning of section 2, Article XIII, Constitution. (*State ex rel. Tipton* v. *Erickson,* 93 Mont. 466, 475, 19 Pac. (2d) 227; *State ex rel. Toomey* v. *State Board of Examiners,* 74 Mont. 1, 238 Pac. 316, 320; *Edwards* v. *Lewis and Clark County,* 53 Mont. 359, 165 Pac. 297; see, also, *Palmer* v. *City of Helena,* 19 Mont. 61, 47 Pac. 209; *Hotchkiss* v. *Marion,* 12 Mont. 218, 29 Pac. 821; *Re Application of the State to Issue Bonds to Fund Indebtedness,* 33 Okl. 797, 127 Pac. 1065.)

Plaintiff contends that the title of the Act does not comply with the constitutional requirement, in that it is deceptive and therefore must be condemned because the subject of a tax levy is not fairly expressed therein. Reference to the title shows that the Act authorizes the issuance of bonds and concludes with the phrase "and Providing for the Payment Thereof." We are not impressed with this contention. All that is required to meet the constitutional provision (Art. V, sec. 23), is that the "Act shall be germane to the subject expressed in the title. It is not necessary that the title shall embody the exact methods of the application or procedure, where the general object is plainly expressed." (*Arps* v. *State Highway Com.,* 90

Mont. 152, 171, 300 Pac. 549, 557; see, also, *State* v. *Driscoll*, 101 Mont. 348, 353, 54 Pac. (2d) 571; *State ex rel. Riley* v. *District Court*, 103 Mont. 576, 64 Pac. (2d) 115, and *Barbour* v. *State Board of Education*, 92 Mont. 321, 13 Pac. (2d) 255.)

While reference to an *ad valorem* tax levy was not expressly made in the title, the general statement was made providing for the payment of the refunding bonds. A tax levy is the usual mode of procedure by which state obligations are often discharged, and in our opinion the average legislator or citizen, wary or unwary, was sufficiently apprised of the contents of the bill by its title.

The procedure proposed by the State Board of Examiners gives rise to the third question presented. It is embodied in the following resolution adopted by the board: "Said bonds will be general obligations of the State of Montana; will be issued in denominations of One Thousand Dollars ($1,000); will be dated July 1, 1939; and will be serial bonds due and payable over a period of five years from the date of issuance, as follows: One Hundred Fifty Thousand Dollars ($150,000) on July 1, 1940, the same amount on July 1 of each of the years 1941, 1942, and 1943, and the balance thereof on July 1, 1944."

Section 2 of the Act, relating to the type of bonds to issue, provides: "Said bonds shall bear interest at a rate not exceeding four per centum (4%) per annum, payable semi-annually. The bonds shall be either amortization or serial bonds, shall bear such date as the state board of examiners shall prescribe and shall be payable over such period of years, not exceeding twenty (20), that the said board of examiners may specify. All bonds shall be optional and redeemable five (5) years after the date of issue and on any interest payment date thereafter at the option of the state board of examiners."

It seems to us to be beyond argument that the last provision of section 2 could not possibly be necessary or applicable to the plan outlined in the resolution. At the end of five years the bonds will all be paid or they will be delinquent, past due and callable without any further provision in that respect. The period of five years provided for payment is within the terms of

the statute. The inclusion of the last provision of the section would be without effect and meaningless. The procedure adopted by the board is appropriate.

The further question arises: Is the chapter now in full force and effect, and if bids are received and accepted for refunding bonds at this time, will the bonds be valid?

Every statute unless a definite time is prescribed therein, takes effect on the first day of July of the year of passage and approval. (Sec. 90, Rev. Codes.) This Act provides that it shall be in full force and effect from and after its passage and approval, which was on March 9, 1939.

Section 1, Article V of our Constitution, defines the legislative authority of the state as residing in the legislative assembly and the people. It provides for the referendum of certain measures and the method for invoking such referendum. A specific provision of that section is as follows: "Any measure referred to the people shall still be in full force and effect unless such petition be signed by fifteen per cent. of the legal voters of a majority of the whole number of the counties of the state, in which case the law shall be inoperative until such time as it shall be passed upon at an election, and the result has been determined and declared as provided by law." No referendum of the measure was ordered by the legislative assembly. The people themselves by petition may invoke the referendum at any time within six months after the adjournment of the legislative assembly. That period has not expired and will not expire until September. In the interim is the law in full force and effect, and, if so, and the proposed refunding bonds are sold and delivered, are they valid?

Both of these questions must be answered in the affirmative. The Constitution itself, as appears from the language quoted, specifically provides that any measure referred to the people "shall still be in full force and effect" until it shall become "inoperative" by reason of the signing of a petition for referendum by fifteen per cent. of the legal voters of a majority of the whole number of the counties of the state, or a referendum may be invoked without suspension by a lesser number of voters.

The chapter was duly enacted by the legislative assembly and approved by the Governor. It was in full force and effect according to its own terms on the day of approval, March 9, 1939, and by virtue of the Constitution itself it is now operative and in full force and effect.

In the case of *Fitzpatrick* v. *State Board of Examiners*, 105 Mont. 234, 70 Pac. (2d) 285, 287, the State Insurance Act was before us. That Act was enacted in a manner similar to this one, but thereafter the referendum was invoked and the measure defeated at the polls. There we said: "The State Insurance Act was in full force and effect during the interim allowing the people to act between its operative date as declared in the Act itself, and the date of the declaration of the result of the election. (Article V, sec. 1, Constitution; *State ex rel. Esgar* v. *District Court*, 56 Mont. 464, 475, 185 Pac. 157.)"

Some further discussion with relation to the referendum was contained in that opinion. The matter was also discussed somewhat in a special concurring opinion in the *Esgar Case*, cited in the *Fitzpatrick Case*; it was also discussed to some extent in the case of *In re McDonald*, 49 Mont. 454, 143 Pac. 947, Ann. Cas. 1916A, 1166, L. R. A. 1916B, 998. If anything said in any of the opinions cited can be construed as contrary to what we have just held, the same is specifically overruled.

Any other conclusion than that we have just announced would be contrary to the express words of the Constitution, and would stop the wheels of state government for six months after the adjournment of the legislative assembly in so far as laws subject to referendum are concerned; and that means nearly all of them, because most of the Acts passed by the legislative assembly are subject to referendum. Such a chaotic condition was wisely avoided by the Constitution.

Holding, as we must, that the law is now operative and in full force and effect, should the state now sell the bonds authorized by it, would such bonds be valid? It must necessarily follow that they would be. To hold otherwise would deprive the bondholders of their property without due process of law, contrary to the Fourteenth Amendment to the federal Constitution,

U. S. C. A., and section 27, Article III of the Montana Constitution. It would also be contrary to the spirit of section 2, Article XIII of the Montana Constitution, which declares: "The legislative assembly shall not in any manner create any debt except by law which shall be irrepealable until the indebtedness therein provided for shall have been fully paid or discharged." While this debt was not created by the legislature, the spirit of the provision is persuasive. It follows that, should the bonds be sold while the law is in full force and effect for practical purposes, referendum of the chapter could not affect the transaction, as every part thereof is vital to the contract contained in the bonds and necessary to support the obligations incurred, and to protect the bondholders in the assurance of the payment of the indebtedness created.

The application for injunction is denied and the proceeding dismissed.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES MORRIS, ANGSTMAN and ERICKSON concur.